N. P. GILLESPIE ET AL. v. JEWELL P. LIGHTFOOT, ATTORNEY-GENERAL.

No. 2141. Decided May 4, 1910.

#### 1.—Constitutional Amendment.

An Amendment of the Constitution is an exertion of the sovereign power of the people of the State to give to their expressed will the force of a law supreme over every person and every thing in the State, so long as it does not conflict with the Constitution of the United States. The rule so established bears down and supplants all other laws and rules that are inconsistent with it. (P. 361).

#### 2.—Same—Case Stated—School Districts—Bonds—Validation by Constitutional Amendment.

An independent school district was created and organized, embracing territory from three contiguous counties, and bonds were issued and sold by it. Such districts were afterward held to be of no effect because unauthorized by law (Parks v. West, 102 Texas, 11). Thereupon the organization of the district was abandoned, a town therein assuming control of its schools, and new districts being created by county authorities within their county limits. Contracts and obligations for conducting their respective schools were entered into by these new districts. Then an amendment to the Constitution of the State was adopted by which every school district theretofore formed, though lying partly in two or more counties, was declared to be and from its formation to have been valid, and lawful and bonds theretofore issued by such districts were validated and the levy of taxes to meet them authorized and directed. (Amendment of 1909, adding sec. 3a to art. 7, of the Constitution.) The original independent school district then resumed its organization, authorized and issued further bonds for building a school house, and on the refusal of the Attorney-General to certify such bonds, as required by the statute (Act of February 18, 1909, Laws 31st Leg., p. 20, sec. 77) sought writ of mandamus to require him to do so. (Pp. 360, 363). Held:

(1) That the constitutional amendment, though its literal application would validate the districts organized out of the territory embraced in the original independent school district, as they existed at the time the amendment was adopted, equally with the then abandoned original independent district itself, can not be so construed, since the result would be to establish in authority over the same territory two sets of officers exercising, in opposition to each other, the same lawful power. (Pp. 362–366).

(2) That the obvious purpose of the amendment was to save from destruction the county line districts affected by the decision in Parks v. West; this should be given effect by recognizing such district to be reestablished by the amendment as one valid from the beginning, and nothing in the Act inconsistent with this result can stand, such as the continued existence of other districts within its territory. (P. 362).

(3) The creation of such later districts out of the original territory was not authorized, if such original district is to be held valid from the beginning; but they are to be treated as quasi corporations, so far as to make bonds issued and obligations incurred by their trustees valid claims against the taxing power over property within their limits, but not so far as to continue their corporate existence for the purpose of enforcing such claims. (Pp. 362, 363).

(4) That relators were entitled to mandamus requiring respondent to give the certificate sought.

Original application to the Supreme Court for writ of mandamus against the Attorney-General.

*E. M. Marr* and *Scott, Sanford & Ross*, for relators.

*Jewell P. Lightfoot*, Attorney-General, respondent, in pro per.

MR. JUSTICE WILLIAMS delivered the opinion of the court.

The question in this case is as to the duty of the respondent to give the statutory certificate to bonds sought to be issued by what is claimed by relators to be an independent school district, named the Mart High School. It is conceded by respondent to be his duty to give the certificate if the district named has the lawful power to issue the bonds, and whether or not it has such power is the question now to be decided. The Mart High School had its origin in 1902 in an attempt of citizens and authorities of McLennan, Falls and Limestone Counties to incorporate and establish an independent school district, under that name, out of territory taken from each of these counties, including the town of Mart. It was of the same character as the district of Mertens, held by this court in June, 1908, to be forbidden by the Constitution. Parks v. West, 102 Texas, 11. At an election held in 1909, two amendments to the Constitution were adopted, the one more particularly applying to this controversy being as follows:

"Sec. 3a. Every school district heretofore formed, whether formed under the general law or by special Act, and whether the territory embraced within its boundaries lies wholly within a single county or partly in two or more counties, is hereby declared to be, and from its formation to have been, a valid and lawful district.

"All bonds heretofore issued by any such districts which have been approved by the Attorney-General and registered by the Comptroller are hereby declared to be, and at the time of their issuance to have been, issued in conformity with the Constitution and laws of this State, and any and all such bonds are hereby in all things validated and declared to be valid and binding obligations upon the district or districts issuing the same.

"Each such district is hereby authorized to, and shall, annually levy and collect an ad valorem tax sufficient to pay the interest on all such bonds and to provide a sinking fund sufficient to redeem the same at maturity, not to exceed such a rate as may be provided by law under other provisions of this Constitution. And all trustees heretofore elected in districts made up from more than one county are hereby declared to have been duly elected, and shall be and are hereby named as trustees of their respective districts, with power to levy the taxes herein authorized until their successor shall be duly elected and qualified as is or may be provided by law."

It is not denied by respondent that this had the effect to make legal and valid, for the purpose of further conducting and controlling the public schools therein, as well as for meeting their bonded indebtedness, all county-line districts where no change of status had taken place before its adoption and after the decision referred to. The difficulties which he presents arise out of action taken upon the

territory embraced in the Mart High School district during that interval. After the decision the district organization was abandoned. The town of Mart assumed control of its own schools, the territory in Falls and Limestone Counties were distributed by the respective Commissioners' Courts into common school districts, and that in McLennan County, outside of the town, was left without connection with any district. The several districts thus brought into existence were fully organized, with trustees elected, taxes levied to support schools, schoolhouses built by private subscription in some of them and contracts made with teachers under which schools are being carried on. This was the status existing when the amendment was adopted. Since that time the city council and school trustees of the town of Mart have passed resolutions renouncing control of the schools and have conceded it to those persons who were acting as trustees for the Mart High School district at the time of the decision in Parks v. West. Those persons have taken all the necessary steps preliminary to the issuance of bonds, and the only objections raised were thus stated to relators by the Attorney-General in refusing the certificate:

"First, because the constitutional amendment adopted by the people in the year 1909 did not validate the old independent district, but validated the districts in existence at the time the said constitutional amendment was adopted.

"Second, the only effect of the adoption of the constitutional amendment was to validate the outstanding bonds of said district and to authorize the trustees to levy a tax to retire same, inasmuch as a portion of the territory of the district had been appropriated and other districts created out of same at the time said constitutional amendment was adopted by the people.

"Third, because Falls County, prior to the adoption of the constitutional amendment, at a time when they had a legal right to do so, created out of the Falls County territory of said independent school district a common school district in said Falls County, and have levied taxes and entered into contracts for the maintenance of a school in said common school district; and to recognize said independent school district and approve said bonds would have the effect of violating the obligations of said contract and would create two school districts occupying the same territory at the same time in violation of law, and would have the effect of authorizing the levying and assessing of taxes in said territory for each of said districts to the amount of fifty cents on the one hundred dollars valuation, in violation of the Constitution of this State."

A fourth reason was given originally, but was abandoned by the respondent at the argument of the cause.

The amendment of the Constitution is an exertion of the sovereign power of the people of the State to give to their expressed will the force of a law supreme over every person and every thing in the State so long as it does not conflict with the Constitution of the United States. The rule so established bears down and supplants all other laws and rules that are inconsistent with it. In determining rights controled by it we, therefore, have only to ascertain what it means

and give it full effect, so long as it encounters no opposition in the higher law of the Federal Constitution.

The school districts referred to in the first clause are declared *to be,* and from their formation *to have been,* valid and lawful districts. Whether they were in truth valid or not, under the law as it existed before, they are to be treated now as if they always were and yet are valid. By the express language of the people, the law which made them formerly invalid, according to our decision in Parks v. West, is changed so that they are henceforth to be regarded as continuously lawful from their formation. There is nothing to prevent the people from establishing such a rule, so long as they do not destroy rights protected by the Constitution of the United States. And we think it will be found that the existence and recognition of such rights, if there be any, will not be inconsistent with the existence in this district of the power here asserted by relators. So we put to one side, for the present, any such question, in order to ascertain the meaning of the amendment. The difficulty with its language is that it makes its declaration respecting every district "heretofore formed" in either of the ways specified. In the case now before us we have to deal with a county-line district that had been formed before the decision of Parks v. West declared it to be invalid, and with several others formed afterwards and constituted wholly or partially of territory included in the former one. All, in the language of the amendment, were "heretofore formed." Can it be held that every one of them is henceforth to be regarded as legally existing? If not, does the amendment operate upon the former, or upon the latter? That the future existence of all, for the purpose of controlling the schools, is not to be recognized is obvious and is conceded by every one. Such a construction would establish in authority over the same territory two sets of officers exercising in opposition to each other the same lawful power. If not all, which is to be the repository of that power for the future? It is easy to see that a purpose, probably the main purpose, of the amendment was to save from destruction the county-line districts affected by the decision referred to. That much is certain from the history as well as from the language of the amendment. They are expressly mentioned several times. From this results the further proposition that nothing can stand the existence of which is inconsistent with the rule declared as to such districts. That rule is that they are to be considered as having always had a lawful existence. Since they were "formed under the general law or by special Act" their legality is established by the very language of the first clause of the amendment. While others, such as those subsequently formed in the same territory, are also within the words, "heretofore formed," it can not be said of them, consistently with the assumption of the original and continued validity of those first formed which the amendment requires us to make, that they were "formed under the general law or by special Act," for the reason that no such authority over valid independent school districts as that exercised by the authorities of the town and the counties over the Mart High School district, was given by law to those bodies. Viewed as valid districts, those of the kind to which Mart High

School belonged were quasi corporations, the officers of which exercised control over all the territory included in them for the purpose of supporting and conducting the public schools therein, and the school laws regulating the formation of independent school districts seem to exclude the existence of any such power over the territory of one lawfully constituted as the Commissioners' Courts of Falls and Limestone Counties and the authorities of the town of Mart exercised over the district in question. Such districts are established in order that the territory in them may be utilized for the maintenance of their schools, and, for such purposes, they are put in the control of trustees chosen by their own people. They become legal entities, with power to levy taxes, incur obligations, maintain and conduct schools, for which purposes the property situated in them is liable to be taxed. The power of Commissioners' Courts to change their boundaries, given by section 52 of the Act of 1905 (p. 277), is subject to limitations which show that it was not intended thereby to authorize action such as that taken by the Courts of Falls and Limestone Counties with respect to the territory of lawfully constituted independent school districts. That action evidently was taken because of the decision of this court holding such districts as the Mart High School to be invalid and because it then had no legal existence as an obstacle to the course taken, and not as the exercise of the power given by the statute referred to merely to change boundaries. That the town of Mart would not have had power to take itself out of a legal independent district in which it had been lawfully included is evident from the provisions of the Act of 1905. (Sections 149, 151, pp. 302-3.)

We think, therefore, it may safely be assumed that without legislative action, or legislative authority extending beyond any in the then existing laws, a lawfully constituted independent school district could not have been disestablished by such action as was taken by the authorities of the town and counties. That those authorities really had power to act as they did, on account of the invalidity of the Mart High School district; that all they did and that all rights which arose out of their transactions were originally legal and valid, and that there may be such rights outstanding for the enforcement of which provision must be made, we propose to assume throughout, and yet to indicate how that does not interfere with our construction of the amendment.

From what has been said it seems to follow that a coexistence, by force of the amendment, of the Mart High School district and the others formed from its territory is logically impossible. If the first is to be treated as valid from the beginning, as the amendment commands, the others must be treated, for present purposes, as having been unauthorized from the beginning, for the reason above explained, that a district of the character now given to the former could not have been destroyed by such action as was taken. The amendment must not be construed as authorizing inconsistent things—as establishing school districts, the existence of one of which will conflict with that of another. Its language, interpreted literally, might establish the validity, past and present, of every school district that

had, at any time before its adoption, been formed in Texas by general or special law, although it may long ago have passed out of existence and been absorbed by other organizations. Of course, its purpose was not so comprehensive. Unquestionably it was intended to give constitutional and legal sanction to such districts as, for want of it, were invalid; to save and not to destroy rights. And it is from the proposition that there was no purpose to invalidate any districts the position of the Attorney-General gets its chief strength. With much force it is said that the Mart High School district never having had legal existence until the passage of the amendment, and having been no obstacle to the assumption of the control of its schools by the town of Mart, nor to the formation of common school districts by the Commissioners' Courts of the counties, the action of those bodies was lawful when taken and had the effect of creating perfectly valid school districts covering a large part of the area of the invalid district; that more than one set of district officers can not legally govern at the same time the same territory; and that, therefore, to construe the amendment as establishing the Mart High School district in control of such territory for school purposes would make it invalidate the others, when there was no purpose to invalidate any, and although those others themselves come within the protecting language of the amendment. In the same line of thought it is suggested that such destruction of existing districts, like those formed out of the old Mart High School district, may be avoided if the amendment be held to make valid and establish them as the districts to continue in control of the schools in future, and to make valid those which have been divided up only for the purpose of enforcing the rights of bondholders as provided in the second and third clauses; and to make valid, for all purposes, districts previously invalid out of whose territory no others had been "heretofore formed," that is, formed before the adoption of the amendment. This suggests a rational way in which an amendment might have provided for conditions like those with which we are dealing, but we are unable to see that the language of the one in question so adjusts itself; and, of course, that language must be followed to the conclusion to which its meaning leads. There is nothing in it which suggests any difference in the effect it is to have upon different districts. All those to which it applies are declared to be valid now and to have been valid from their formation. The declared validity is the same in all cases in its extent and in the purposes for which it is established. It is, and from the beginning has been, complete. The bonds declared to be valid are those of all "such districts." The powers given to "such districts" and their trustees are given in the same language and to the same extent to every one. How, then, can we say that one is made valid for the purpose of taking charge of schools, levying taxes, building schoolhouses, employing teachers and doing everything authorized by the general school laws, while another remains merely a territory upon which taxes may be laid for the sole purpose of paying bonds previously issued. If the latter is true of one, it is true of all. That it is not true of any is shown by the language of the first clause. Every district treated of is declared to be and to

have been "a valid and lawful district." When a district is thus established, its powers and duties are ascertained from the laws regulating districts of that character; for by the mere force of such a declaration it is put upon an equal footing with all lawful districts of its kind. From this it follows that a validated district is to be treated as if it had always had the power given by law to districts legally established, until those powers are taken away or diminished by law; and to say that some that are thus validated are given less powers by the amendment than others is to make a distinction the amendment does not make.

At the foundation of the argument we are considering lies the assumption that the districts formed after the abandonment of the Mart High School district are themselves established by the amendment, and the force of the argument from that assumption is that it would be inconsistent with such effect of the amendment to hold that it also establishes the Mart High School district with officers controling the same territory. We think the assumption is wrong. As we have before pointed out, there can be no question that the infirmity in county-line districts, due to a want of constitutional authority to form them, is cured, and that those districts are all declared to have been valid from the first to the same full extent. It must follow, as we have also said, that every district, however established, that is inconsistent with the will of the people thus expressed must go down before the amendment. It would be inconsistent with the rule declared, that is, that the county-line districts were all the time and yet are, valid, to admit the continued existence of districts which could never have been legally formed out of such a district without implying its invalidity. The view taken by us does not, as was argued by respondent, prevent a full recognition of the legislative authority over such districts now and in the past. Our holding only goes to the extent that such districts as the Mart High School are made valid and thereby placed upon the same plane as other valid districts, and does not involve any such proposition as that they are, or have been, any more exempted from change by the Legislature, or under its authority, than other districts lawfully constituted have been. Our present holding is based upon the inconsistency between the rule of the amendment, that such districts must be treated as having always been valid, and a construction of it which would allow the continuance of others, when the legality of their formation depends on a denial of the validity of the former. It does not follow that a change made as authorized by law in the case of valid districts would conflict with the amendment. No question of the kind is before us.

That the broad language in which the amendment is expressed, taking no account of the differing conditions which existed, gives rise to embarrassment and difficulty, both theoretical and practical, in applying it must be acknowledged. The theoretical construction which we think should prevail is given in what we have said. There may be some practical difficulties in its application, but none, it is hoped, that will prove serious. There are some practical considerations against that suggested by respondent which may be stated. That such

districts as Mart High School are continued for the purpose at least of paying their bonds is and must be conceded. That indebtedness was incurred and the money doubtless expended for the establishment and future maintenance of a school system for that district. The restriction suggested as to the effect of the curative provision would impose upon the people of such districts the burden, while denying to them, to a great extent, the benefits of the expenditure. The people of the State in voting this amendment, intended to make those of the districts repay the money the benefit of which they were supposed to have gotten, but not, at the same time, to deprive them of that benefit. Another difficulty in following the theory of respondent would be that it would make the amendment apply unequally and uncertainly to different situations. Even in the case we have, all the territory of the original district has not been included in others. In supposable situations much of it may not have been so disposed of. What would be the effect of the amendment on such territory? Would the original district and its organization be restored as to it, controled by its officers, and yet disassociated from that put in other districts? How much of the territory of an old district must have been withdrawn in order to deprive it of power as a school district equal to all others?

As we have before indicated, the theory we adopt may have to be departed from in dealing with rights that may have arisen against districts while lawfully existing. We have no such rights before us and this proceeding involves no contention that denies their existence and validity. That for the purpose of satisfying them, if they exist, it may be necessary to treat the property of the district against which they arose as charged for their payment, does not make it necessary to deny the claim of relators, as the trustees of the Mart High School district, of the right to control at present the schools in its territory and to exercise the powers given them to that end. The difficulties alluded to are probably more theoretical than practical. Good sense and a desire to act justly, which may be credited to the people and authorities in such localities, will very probably solve them practically. And it must not be forgotten that in providing for adjustments that may become necessary in putting the amendment practically in operation, the Legislature will have from the two amendments extensive authority over all districts. In either view, that of respondent, or that taken by us, there may be found rights of bondholders, or of others, against the district treated as superseded for the satisfaction of which provision must be made against such district notwithstanding its supersession. That is not what we are now dealing with. The power to control for present and future purposes the schools in the district and to do what is essential to that end is what relators claim.

After the most careful thought we have been able to give to the subject we have concluded that relators are entitled to the certificate.

*Mandamus awarded.*