[No. 7228.]

THE PEOPLE EX REL. ATTORNEY GENERAL v.
CASSIDAY ET AL.

1. **Constitutional Law—Amendment of the Constitution—Power of the People**—The people of the state have plenary power to provide, by constitutional amendment, such methods of government for the state, or any portion of the state, as may please them, so long as there is no violation of the federal compact. To confer upon the people of a particular community authority to designate the agencies by which governmental duties therein shall be discharged is not obnoxious to any provision of the enabling act or of the federal constitution.—(513, 514)

2. **——Construction of the Constitution—Power of the Courts**—Where any provision of the constitution is framed in doubtful or uncertain language, it is the province of the courts to construe it; but it is not within the province of the court to substitute other words for those used in the constitution, or place any forced construction thereon, or eliminate words found therein.—(522)

3. **——Construction of Amendments**—An amendment of the constitution is to be considered, treated and construed, as if it had been written therein in the first instance.—(507)

4. **——Article XX** is, in all its provisions and for all purposes, a part of the constitution, according to its clear import. Neither sec. 2, nor any other provision of that article, has the effect, or assumes to, set aside governmental duties and functions as to state and county affairs, within the territory named. Its whole effect is, to provide that the people of the city and county of Denver, shall, through their charter, designate the agencies which are to discharge those duties and functions which, elsewhere in the state, pertain to county officers, all which functions and duties are preserved intact.—(510, 511)

This does not create a government unrepublican in form

or involve any inhibition of the federal constitution, and was clearly. within the powers reserved to the people of the. state, upon entering into federal compact. The doctrine of the majority opinion in The People ex rel. v. Johnson, 34 Colo. 143, rejected, and that case overruled.—(511-513, 535)

5. ——County Officers in Denver—Since the adoption of this article, and the formation of the municipal corporation of the city and county of Denver, there has never been within the limits thereof a county office, or county officer, as such, except as this proposition may have been affected by the decision of this court in Johnson's case, supra.—(507, 508)

6. Judgments—Upon Whom Conclusive—There is no privity of title between one occupying an elective office, and a former incumbent, chosen at a different election, at a different time and for a different term. A judgment in quo warranto favorable to certain persons claiming to have been elected county commissioners of the city and county of Denver was held not conclusive as to the title of other individuals, claiming the same office, under a subsequent election, which was held under the same supposed authority as that by which the former board claimed to have been chosen. The election in each case being determined to have been without authority of law, and the first judgment erroneous, the later incumbents were expelled on quo warranto brought.— (523, 524)

7. ——Effect—Res Judicata—The determination of an abstract question of law does not bind other parties, in a subsequent litigation involving the same question. The thing determined in the particular litigation becomes res judicata, and may not be challenged between the parties, even though the question of law by which the litigation was controlled is afterwards determined to have been incorrectly decided and applied; but the decision and application is not necessarily binding upon the court in another litigation. A judgment against a public officer as such, relating to a public right, duty, power, liability, or obligation, attaching to the office, binds his successor, who so far as he is affected by such determination is properly regarded as in privity with his predecessor. So far as such prior determination affects the title of the prior incumbent to the office, it has no effect upon the successor.—(524-527)

8. ——Stare Decisis—The maxim stare decisis rests upon grounds of public policy. The courts will generally adhere to a former decision, though found to be erroneous, where it has long been acquiesced in, and especially if it has become a rule of property. But where public rights are involved, and a decision regarding them is to have a direct and permanent influence, it

is the duty of the court to carefully reconsider the question, and permit no previous error which can be corrected, to be perpetuated.—(527, 528, 531-533)

Accordingly a previous decision of the court involving the construction of a provision of the constitution which provides in plain and express terms a form of government for a particular community, permanent in effect until changed by the people and by which decision, based upon assumptions and supported by reasoning, which the court upon further examination declared to be false and unsound, the provision in question was in effect nullified, was rejected and overruled.—(535)

### Original Proceeding in Quo Warranto.

Hon. JOHN T. BARNETT, attorney general, Mr. R. D. THOMPSON and Mr. HARVEY RIDDELL for the people.

Mr. JOSHUA GROZIER, Mr. E. F. RICHARDSON and Mr. HENRY A. LINDSLEY, amici curiae.

Mr. HENRY J. HERSEY, Mr. RALPH TALBOT and Mr. N. WALTER DIXON, for respondents.

Mr. JUSTICE BAILEY delivered the opinion of the court:

This is an original proceeding, in *quo warranto*, in the name of the people, on relation of the attorney general, requiring the respondents, holding and exercising the duties of the office of county commissioners of the city and county of Denver, to answer and show by what authority they assume to hold and exercise the duties of such office. Under the issues, as framed by the petition and writ and the answer and return thereto, the soundness of the reasoning upon which the conclusions were reached in the case of· *The People ex rel. Attorney General v. Johnson*, 34 Colo. 143, is directly challenged. The application involves, in the main, a consideration and construction of section 2 of article XX of the constitution of the state.

In the Johnson case, the right to name in the charter two persons instead of one to discharge the duties devolved by the constitution and general laws upon the county judge, was involved, but the decision was not placed upon the ground that that could not lawfully be done, nor will that question be now considered or decided. That case was determined upon the broad proposition that the people of the whole state could not amend their constitution so as to permit the people of the consolidated body known as the city and county of Denver, by their charter, to name agencies, other than those already provided by the constitution and general laws, to discharge, within that territory, governmental duties relating to state and county affairs. We therefore direct our attention to a consideration of the application exclusively along these lines.

As in the Johnson case, so now, we are chiefly concerned with an interpretation of this particular section, not to a consideration of article XX as a whole, or the charter of Denver, except as they, or some portions of them, may be incidentally involved. Upon the main question we are relieved of the necessity of as full argument and citation as otherwise might be necessary, because of the convincing, exhaustive and unanswerable discussion of the subject in the dissenting opinion of Mr. Justice Steele in the Johnson case, concurred in by Mr. Justice Gunter, and the dissenting opinion of the latter in the case of *The People v. Horan,* 34 Colo. 304, concurred in by Mr. Justice Steele. We adopt the reasoning of both of these dissenting opinions, and refer to and rely upon them, and the authorities cited, to support the views now expressed, and the conclusions here reached.

Let it first be fully apprehended, a thing which seems to have escaped the attention of a majority of

the court in the Johnson case, that article XX, as written, is a part of the constitution of the state, the same as any other of its provisions, and is as much in force as any part of the original constitution itself. It is not only a part of the constitution, but it is there to stay, until the authority which voted it in shall vote it out. It, as any other part of the constitution, is to be given force and effect according to its plain intent, purpose and meaning. When the whole people speak through a fundamental law, or by amendment thereto, not in conflict with the federal constitution, all should hear and heed, more especially the courts, whose function is to interpret, and, where possible, uphold and enforce, not nullify, overthrow and destroy the law. It is not too much to say that, had article XX been written in the original constitution, no one would ever have had the temerity to question the propriety of its provisions and their effectiveness. This article must now be considered, treated and construed as if thus originally written therein.

Section 3 of the article, by express provision, terminated, upon its adoption, the terms of office of all officers of the then city of Denver, of the included municipalities and of the old county of Arapahoe, a portion of which, together with the city of Denver and included municipalities, were then merged into the consolidated municipality of the city and county of Denver. It in effect did away with all county officers and offices, purely as such, in the consolidated territory, and provided a single set of officers or agencies to perform, in the new municipality, all duties of a local nature and all duties pertaining to governmental, state and county affairs as well. The conclusion is irresistible that, since the adoption of that article, and the formation of the city and county of Denver, there has never been, within that terri-

tory, a county office or county officer, as such, except only to the extent that this situation may have been affected by the decisions in the Johnson and other so-called county officers' cases.

Keeping in mind, then, that, within the territory comprising the city and county of Denver, no county office, or county officer, as in other counties of the state, exists, we come to a consideration of the meaning and purpose of that portion of section 2 of article XX, which reads:

"The officers of the city and county of Denver shall be such as by appointment or election may be provided for by the charter; and the jurisdiction, term of office, duties and qualifications of all such officers shall be such as in the charter may be provided; but every charter shall designate the officers who shall, respectively, perform the acts and duties required of county officers to be done by the constitution or by the general law, as far as applicable."

There is no element of uncertainty about this provision. It needs no construction; it interprets itself. The question is, shall it be given its plain, obvious and common-sense meaning, and enforced accordingly, as other provisions of the constitution are interpreted and enforced? There is no apparent reason for doing otherwise. Why scrutinize article XX in hostile spirit or treat it as an interloper? It is a child of the same parentage as the original constitution. This court has again and again held it to be a part thereof, and it is so in all its provisions, and for all purposes, according to its clear intent.

This section does not imply that there is no county or county government within that territory; there is therein a county and a county government, just as both exist in other portions of the state. Section 2 not only does not, in fact, set aside governmental duties and functions as to state and county

affairs in this territory, it does not even pretend to
do so, and by no stretch of the imagination can it be
fairly held to do so. Neither is there any other pro-
vision of article XX which does it. These duties are
fixed, absolutely fixed, until changed by the same
power which created them. Section 2 expressly rec-
ognizes that such duties are in existence and must
be discharged, and forthwith proceeds to provide and
declare by whom they shall be performed. The
whole people of the state have declared, by their
fundamental law that this may be done. That was
a question of governmental policy for the people to
determine, and this policy, when once declared, may
not be ruthlessly set aside by the courts, except it is
shown to violate in some way the federal compact
with the state. It is fundamental that no part of the
state constitution itself can be inoperative unless so
because in conflict with some provision of the enab-
ling act or the federal constitution. All that article
XX purports to do relative to the county offices is
to provide that the people of the city and county of
Denver, through their charter, shall designate the
agencies, which are to discharge the respective du-
ties and functions which pertain to them. There is
no warrant or authority in article XX to the people
of the city and county of Denver to alter, change or
dispense with such acts and duties. They remain,
as before, subject to the constitution and general
laws, and are exclusively under the control of the
legislature. The people of the city and county of
Denver have not been given, and do not have, the
power by charter to in any way change the duties
of governmental officers, so far as they relate to state
and county affairs, and there can be no ground for
such contention if article XX be properly read and
understood. The city and county of Denver has not
been freed from the constitution. It is as much sub-

ject to it as any other part of the state. Article XX
is a part of the constitution. Upon its adoption cer-
tain portions of the constitution, as it theretofore
existed, became inapplicable to this particular terri-
tory, because of the express provision of the new
article. This article, to the extent which it under-
took to do so, being the last expression of the people
upon the subject, modified the constitution so far as
it applied to the territory in question, and certain
provisions thereof became inapplicable therein. Ar-
ticle XX is a grant of power to the people of the city
and county of Denver, where theretofore no power
in that respect existed, to do certain specific things,
relative to the designation of agencies to discharge
in that territory governmental duties fixed by the
constitution and general laws. They have just such
power and authority in this behalf as the article
gives them, no more, no less.

So that, the opinion of this court in the Johnson
case notwithstanding, the sole question is whether
the authority given by article XX to the people of
the city and county of Denver to name the agencies
by which governmental functions in that territory
are to be discharged is subversive of state govern-
ment and unrepublican in form? To merely ask the
question, in the face of the facts as they are known
and conceded to be, is to answer it. How, possibly,
can the fact that different agencies than those pro-
vided for other counties of the state are in this ter-
ritory to perform governmental duties, when all
such functions are carefully preserved and their dis-
charge provided for, be held in any manner to affect
state government? What federal inhibition is in-
vaded because the officers so designated may be
chosen in the early spring-time rather than in the
autumn, that they serve for four years rather than
two, that they are designated by one official title

instead of another, or that one set of officers is named to discharge the duties in that territory pertaining to both local and governmental affairs, since all such governmental acts and duties are retained 'intact therein and are to be fully performed?

The government, provided for the city and county of Denver by article XX, rests solely upon the will of the people of the whole state, and is the creature of such will. It is a full and complete answer to the contention that the government so provided is unrepublican in form, to show that it rests upon the will of the people of the entire state, and may be by the same authority either withdrawn or modified. Since the power still resides with the people of the state to completely annul article XX, or amend, alter or set aside any one or more of its provisions at will, that fact demonstrates that a state within the state of Colorado has not been created, for were it otherwise, such change in the constitution, by the people of the state at large, would be impossible.

In the case of *Watts v. Elder et al.*, heard and determined in the circuit court of the United States for the district of Colorado, March 2, 1903, where this same article of our state constitution was involved and under consideration, Judge Marshall, who presided at the trial, speaking to the very point now in question, among other things, had this to say:

"With respect to its being in conflict with the constitution of the United States, it is said that it in effect creates a state within the boundaries of another state. That contention we do not think well taken. It provides for the creation of a municipal corporation resting eventually on the will of the people; established by the will of the people of the entire state of Colorado. That agency of the government is not superior to the creator. Established by the will of the people of Colorado, it may be annulled

by the will of the people of Colorado, evidenced by
some future constitutional amendment. It is in no
sense a sovereign corporation, because it rests on
the will of the people of the entire state and con-
tinues only so long as the people of the entire state
desire it to continue. That the state has the power
of establishing municipal corporations, changing
their boundaries and annulling such corporations
once established, is, of course, familiar law. Such
municipal corporations are ordinarily created by act
of the legislature, but a state may create such cor-
porations in the constitution itself by a constitutional
amendment, and such corporations may be abolished
and changed in like manner. * * * The objec-
tion that this charter government may be unrepub-
lican in form is answered, it seems to us, by the same
argument. There is no charter yet before the court.
The court cannot presume that those formulating a
charter may formulate one in violation of the con-
stitution of the United States. The amendment to
the constitution of Colorado does not contemplate a
charter, unrepublican in form; it contemplates one
resting on the will of the people, one that is subject
not only to the will of the people in a particular mu-
nicipality, but is eventually subordinate to the will
of the people of the entire state, as that will may be
expressed constitutionally. There is nothing in the
amendment itself, it seems to us, that either ex-
pressly or impliedly authorizes the constitution of
an unrepublican municipality.''

In that case, the learned judge found no diffi-
culty in reaching the confident conclusion that the
article itself neither expressly nor impliedly author-
ized the construction of an unrepublican form of
government in the city and county of Denver, and
that a charter framed within the terms of that grant
would not do so.

Until the ingenuity and invention of the human intellect shall have conceived and formulated—which has not yet been done—some sound, or even plausible reason for the conclusion reached in the Johnson case, that article XX provides for the city and county of Denver a government unrepublican in form, that decision must remain, as it now is, wholly unaccountable and incomprehensible, for it must be that the conclusion rests upon that assumption, else it is wholly unsupported.

It is urged, in the opinion in the Johnson case, that if power to legislate in one particular respecting state and county governmental matters, within the consolidated district, may lawfully be given to the people thereof, then it is equally lawful to do the like in respect to all matters. This contention is upheld by neither reason, logic, nor judicial construction. The complete answer to it is that the people of the state have plenary power, by constitutional amendment, to provide just such methods of government for the state, or any portion of the state, as they please, so long as there is no violation of the federal compact. It is clear that the warrant of authority, given to the people of the city and county of Denver to merely designate the agency by which governmental duties therein shall be discharged, is not obnoxious to any provision of the enabling act or of the federal constitution, and therefore it may be, and has been, lawfully done. No other act of legislation by the people of the city and county of Denver, respecting this particular subject-matter, has been authorized by the article. Had the people undertaken, by constitutional amendment, to give the power to the city and county of Denver to dispense with such duties and functions entirely, or in any way alter or modify them, then a different question would be presented, and it may be admitted

that the power to do that does not exist even in the people of the whole state. It will be time enough to consider and dispose of such a question when we are confronted with something more tangible than a purely speculative and imaginary situation. As matters now stand, there is nothing whatever in article XX which gives to the people of the city and county of Denver power to legislate upon anything whatever, concerning matters solely of state and county governmental import, except merely the designation of certain agents to perform therein the acts and duties incident thereto. It may be that the people of the city and county of Denver have, in some particulars, by their charter provisions, exceeded the grant of power given them, and if so, those matters are for correction in proper proceedings to that end. No such questions are now before this court, either for consideration or decision.

In the case of *The People v. Sours*, 31 Colo. 369, the opinion declared article XX to be constitutional, and fixed it as a part of the constitution of the state; not partially constitutional, but constitutional as a whole, throughout its entirety, and in full force and effect. While it was conceded in the Sours case that if the effect of article XX was to displace the constitution, the general laws of the state and the general assembly in the city and county of Denver, it could not be sustained, it was there concluded and determined that the article accomplished no such result, although that opinion has been misinterpreted to the contrary effect, and was thus misapplied in the Johnson case. Let it be remembered that the validity of the article was not attacked in the Sours case, because the power had been delegated to the city and county of Denver to designate the agencies to perform governmental duties; its validity was attacked on the ground, among others, that there would be no

governmental duties whatever within the city and
county of Denver; that governmental duties would
not prevail there, and upon that theory, and that
alone, upon that branch of the controversy, was the
validity of the amendment drawn into question. If
the general laws of the state fixing governmental
duties and governmental functions, would not apply
in this territory, as it was then argued they would
not, it was urged that we would have a state within
a state, an *imperium in imperio,* and a republican
form of government would thereby be destroyed, in
violation of the guarantee contained in section 4 of
article IV of the constitution of the United States.
A complete answer was found to this contention in
the language of section 2 of article XX; and this
court, speaking through Mr. Justice Steele, in the
*Sours case, supra,* declared:

"The provision that 'Every charter shall des-
ignate the officers who shall, respectively, perform
the acts and duties required of county officers to be
done by the constitution or by the general law, as
far as applicable,' completely contradicts the as-
sumption that the amendment regards such duties
as being subject to local regulation and control."

The language of section 2, which rendered it
possible and proper to then declare the whole arti-
cle valid, was in effect eliminated from the article
by the majority opinion in the Johnson case. What
is the meaning of the language, "Every charter shall
designate the officers who shall, respectively, per-
form the acts and duties required of county officers
to be done by the constitution, or the general law,
as far as applicable," if it does not mean just what
it says? It must mean that, or it means nothing.
The language is plain and positive; it is without a
trace of ambiguity. It is a part of the constitution.
It is so plain that construction is unnecessary. What

is to be done with this provision? In the Johnson case, it is utterly ignored and disregarded. In that opinion, it was said that governmental duties are not subject to local control, which is conceded, but that has no bearing upon the question of the authority of the local government to appoint agencies to discharge these duties, if the constitution has clearly delegated that power. No law has been cited, and we confidently assert that none can be found, which shows that it is not competent for a fixed governmental duty to be performed by an agent designated for that purpose by a local subdivision of the state. The meaning of this provision is clear, its terms are unambiguous, the mandate is positive. Something must be done with it. It should be given effect according to its meaning. By the decision in the Johnson case, this provision was set aside and held to be empty and meaningless.

In the case of *The People v. Adams,* 31 Colo., page 476, speaking for the court respecting section 3 of article XX, Chief Justice Campbell pertinently said:

"This language is so clear and imperative as to leave no room for construction. It interprets itself. * * * The avowed object of the general assembly in submitting, and the presumed intent of the people in ratifying, this amendment must be given effect if the language therein employed will allow, even if the result be a withdrawal of restraints upon officers which heretofore have been deemed by the general assembly expedient to prescribe, or the consequences destructive of high efficiency in the discharge of public duty. Its validity is no longer an open question. Plaintiffs do not question it. Indeed, they rely upon it for their title. The fact that the writer of this opinion believed it inoperative and void when its validity was directly attacked should

not, and does not, lead him to nullify its provisions by hostile construction, nor does it comport with judicial propriety stubbornly to persist in further dissent from a decision acquiesced in by all departments of government. Rather, is it the duty of every member of the court to give effect to the article in accordance with the intent of its framers, as far as it can be done consistent with the language in which that intent has been manifested."

Let us apply this vigorous and sound language to the mandate of the people, embraced in section 2 of article XX, where they say that the city and county of Denver in every charter shall designate among its officers thereby created those who shall, respectively, perform the acts and duties required of county officers to be done, under the constitution and general law, and give this provision effect according to its undoubted and obvious meaning, and we have a full, complete, final and lasting solution of all matters here in controversy; and no provision of the constitution has been eliminated, and full force has been given to all of its parts. The constitution may be read from one end to the other, and there is not a clause in it more certain in its meaning than the words used in imposing the duty upon the people of the city and county of Denver, after creating its own local officers, to designate those who shall perform the acts and duties required of county officers to be done by the constitution and general laws. Essentially, the whole case rests upon the meaning of this provision and its enforcement. If section 2 does not delegate the power to the city and county of Denver in its charter, to designate agencies to perform these admitted governmental duties, then the conclusion in the Johnson case is right. On the other hand, if such power is delegated by section 2, and if this constitutional provision is to be enforced

according to its plain meaning, the conclusion in the Johnson case is wrong. In the Sours case, it was held competent for municipal officers, under section 3 of article XX, to perform the fixed duties attaching to county officers; it surely is now equally competent for those duties to be performed at this time by agencies designated in the charter. The Johnson case is firmly planted upon the authority of the Sours case, and were it consistent, it would hold that it is competent for the charter to name agencies to perform governmental duties, and also that article XX is constitutional, in conformity with the reasoning of the Sours case. But the fact is, that the Johnson case declares article XX, in one of its main and most important features, that of permitting the duties pertaining to both county and city government to be discharged by a single set of officers, unenforceable—that is, that a part of the state constitution itself is inoperative. On the other hand, it ostensibly approves and pronounces sound the conclusions in the Sours case, and then proceeds, not in terms, but absolutely so in effect, to overrule and deny them. In other words, if the Sours case stands, and it is not here challenged, nor has it ever been challenged at any time in any court, the Johnson case cannot. Furthermore, for practically eight years the vast business of the city and county of Denver has been carried forward, contractual relations assumed, property titles vested, lands for public parks acquired, public improvements made, enormous issues of bonds put forth, all upon the authority of that decision upholding the validity of article XX. No stronger situation for the application of the rule of *stare decisis* can be found or imagined, upon every consideration which invokes its application, in the light of subsequent events, than that surrounding the decision in the Sours case.

Since it was declared in the Sours case that governmental duties themselves are not subject to local control, it is assumed in the Johnson case that agencies to perform governmental duties cannot lawfully be designated by the local government. It is also concluded in that opinion that, because the county still exists, it follows inevitably that county officers *eo nomine* must also exist. By this course of reasoning, the express provisions of section 2 of article XX are nullified, and the fact lost sight of that a county may exist without regard to the particular name borne by the agencies performing governmental duties therein, and without regard to the precise method of the selection of those agencies. The opinion ignores the fact that special and general provisions of the constitution stand together. Neither destroys the other. The special controls that which it was intended to control, and to that extent displaces the general, while the general controls in all cases where the special provision does not apply. Thus we are confronted with the grotesque spectacle of one case decided upon the authority of another; the main features and principles of which latter case the former flatly overrules.

To the proposition that article XX, being a part of the constitution, controls and supersedes, in so far as the city and county of Denver is concerned, any previous constitutional provisions, in any way conflicting with it, in its application to that new municipality, we quote from the opinion of the supreme court of the state of Illinois, in the case of *City of Chicago v. Reeves,* 220 Ill. 274, as follows:

"In *Huston v. Clark,* 112 Ill. 344, in considering the effect of the amendment to the constitution known as section 31 of article IV, on other provisions of the constitution, the court, on page 349, said: 'The special amendment of the constitution

adopted in 1878, so far as it invades the former limitations of the constitution, must prevail, and such limitations are not applicable to the subject-matter of this special amendment.' * * * In *Moore v. People,* 106 Ill. 376, in discussing the constitutionality of the Drainage Act of 1879, we said: 'The act under which the proceedings were had was passed under the authority of this amendment and authorized by it, and if sections 1, 9 and 10 of article IX ever had any bearing upon an assessment of this character after this amendment became a part of the organic act, it would control, regardless of the provisions of the original constitution.' And in *Wabash Railroad Co. v. Coon Run Drainage and Levee District,* 194 Ill. 310, on page 319, the court said: 'Section 31 of article IV of the constitution of 1870, as amended, under which the statute authorizing the appellee district to become incorporated was enacted, is paramount to constitutional limitations incorporated in the constitution as originally framed, with which it is in conflict. (*Huston v. Clark,* 112 Ill. 344.) To the extent the amendatory section invades the limitations and safeguards erected by said section 13 of article II and section 14 of article XI of the constitution, for the safety and preservation of private property, the provisions of the amended section must prevail, but in all other respects those limitations and safeguards remained unimpaired and in full force and vigor as part of the organic law of the state'."

In *People v. Metz,* 193 N. Y. Court of Appeals 149, to the same proposition it was said:

"In construing a constitution, all its provisions relating directly or indirectly to the same subject must be read together, and any amendment in conflict with prior provisions must control, as it is the latest expression of the people. * * * The pre-

sumption is, that the people, in exercising their supreme power, did not do a vain act, but effected a definite purpose. * * * Every provision of the constitution as it was before it was amended, which so conflicts with the amendment that it cannot be fairly harmonized therewith, necessarily yields thereto, but only to the extent necessary to make the amendment reasonably effective.''

And again, in *Gillespie v. Lightfoot,* 127 S. W. 799, the supreme court of Texas said:

''The amendment of the constitution is an exertion of the sovereign power of the people of the state to give to their expressed will the force of a law supreme over every person and every thing in the state, so long as it does not conflict with the constitution of the United States. The rule so established bears down and supplants all other laws and rules that are inconsistent with it. In determining rights controlled by it, we therefore have only to ascertain what it means and give it full effect, so long as it encounters no opposition in the higher law of the federal constitution.''

A careful consideration of the opinion in the Johnson case is bound to lead to the conclusion that the capacity of the people of the state of Colorado to amend their constitution in any way they see fit is denied. There can be but one ground upon which such denial can be predicated, and that is that the covenants with the federal government have been violated, in that a republican form of government is overthrown with respect to the territory embraced within the city and county of Denver. That opinion holds in effect that it is not competent for those who are selected, under the provisions of the charter, to perform the duties resulting from the operation of the general law, even though such designation is positively commanded by the second section of article

XX, and thus there is no escape from the conclusion that the Johnson case holds that a portion of article XX is void. The constitution makers are sovereign with respect to their constitution, except that they cannot make a constitution, or any part of one, which is destructive of a republican form of government. The only power which the supreme court has to interfere with the sovereign will of the people is when there is a violation of the federal compact. If the constitution makers had used doubtful or uncertain language, it is the province of this court to say what is really meant by such doubtful or uncertain language, but it is neither the duty nor province of this court to substitute any other language for that used by the constitution makers, nor to place any forced construction upon such language, nor to eliminate any language from the organic law of the people. The decision must therefore mean, in view of the plain provisions of section 2 of article XX, that the action authorized thereby is subversive of a republican form of government, and to this conclusion the court, as now constituted, is unable to assent.

In view of the admitted sovereign capacity of the people to make, alter or change their constitution as they see fit, subject only to the federal compact, it being plain that section 2 of article XX does not conflict with the federal constitution, obviously it ought to be enforced; and since, by the Johnson case, it is held inoperative and void, with that conclusion the majority of this court, as now constituted, does not agree. The fundamental error in the Johnson case lies in the refusal of the court to recognize and enforce, as a part of the constitution, which it is, section 2 of article XX, according to its clear, unmistakable and unquestionable meaning.

But it is said that the decision in the case of

*The People ex rel. Lawson et al. v. Stoddard et al.,*
reported in 34 Colo., at page 200, based on the au-
thority of the Johnson case, where the title of the
relators to the office of county commissioner was
determined in favor of them and against the re-
spondents, the then board of supervisors of the city
and county of Denver, is *res judicata* upon the like
question here. The contention is not sound. There is
no privity between the respondents here and the
relators in the Lawson case. These respondents are
serving for a separate, independent and distinct term
of office, to which they were elected at a different
time, and under different conditions and circum-
stances from those which surrounded the relators in
the Lawson case, their predecessors in office. There
is and can be no privity of interest in title to an office
between a predecessor therein and one elected at a
different time, to a different term, thus holding an
independent, separate and unrelated title. The thing
determined in the Lawson case was the title of those
particular relators to the office; such determination
is the law of that case, and is *res judicata* upon that
question between the parties to that suit and privies
to that title, but it has no binding force as to the right
and title of some subsequent claimant, asserting claim
under a separate and independent title, obtained at
another and different election. Nor does it matter
that some purely abstract question of law was de-
termined in a former case, which might be applica-
ble to a later one, and by the application of which
the question of the right to an office in the later case
might be determined, with a like result to that
reached in the former. Whatever force there may
be in the contention for such application depends
solely on the principle of *stare decisis,* not of *res
judicata.* Mere abstract questions of law cannot be
made the subject of litigation, so that when once

determined, such determination must be applied in all subsequent litigation between other and different parties, simply because the same question of law may be involved. Where, in the determination of a case, legal principles are invoked and conclusions thereon reached by the court, whether such conclu-· sions shall be followed in other cases, without further investigation, depends on the rule of *stare decisis,* not of *res judicata.* The thing determined in the particular litigation becomes *res judicata,* and may not be challenged afterward between the parties, even though the question of law by which the decision was controlled is determined thereafter to have been incorrectly decided and applied, but such decision and application is not necessarily binding on the court in other litigation. The question is squarely settled in the case of *State ex rel. Kennedy et al. v. Broatch et al.,* 68 Neb. 687, where a situation precisely like the one here was presented, discussed and a conclusion reached exactly contrary to the contention of these respondents, and in full accord with the views here expressed. This action and the Lawson case are wholly disconnected, both as to parties and subject-matter.

In the Lawson case the right and title of the relators therein to the office of county commissioner for the city and county of Denver for a particular term, long since expired by limitation, was adjudicated. In the case at bar, respondents are required to show by what authority of law they now claim the right to hold and exercise the duties of that office for another and different term than the one involved in the Lawson case. The court is at liberty to determine their title to this particular office, and it is its duty to do so, according to their lawful rights, upon principle and authority, as applied to the facts in this case, not of some other case, and not by the

application of the doctrine of *res judicata,* as the situation not only does not call for such application, but does not even permit it.

In the *Kennedy-Broatch case, supra,* beginning at page 702, the supreme court of Nebraska said:

"Assuming, then, that the relators' claim of right to the office by virtue of appointments made by the mayor is for a different term from the one in controversy and adjudicated in the two prior actions, will those judgments operate as a bar or an estoppel against the respondents who claim by virtue of appointments made by the governor? Do the present appointees of the mayor claim under the same title as that adjudicated in the prior actions, and are they, in a legal sense, as respects such title, in privity with their predecessors in office? It can not, we think, be said that the respondents in the present action claim under the same right and title as their predecessors. It is true they both derive their authority and right to the office from the same source, but there has been no transfer of the title held by their predecessors to them. Each claims by an independent title derived from one and the same authority for a different term of office. The adjudication as to the rights of the parties for the terms for which they were appointed, whether right or wrong, became final and operated as a complete bar against the other contending parties ever afterwards from asserting title to such office for the term then in controversy, but the rule of *res judicata* can not, we think, without going to an unwarranted length, be extended any further. It can not be said that, because of such decision, the court is irrevocably bound for all time to construe the statute unconstitutional, as held in the *Moores case,* nor that the appointees of the mayor under the ordinance enacted by the city council who are holding under a different tenure, merely be-

cause they are successors of the parties to the original litigation, can invoke the doctrine against the appointees of the governor, who are likewise holding for a different term from that involved in the prior litigation."

Numerous authorities have been cited to show that there is privity between the officers now serving and their predecessors in office. An examination of those cases discloses the fact that in every one of them the matter involved had reference, directly or indirectly, to the rights, powers and obligations of officers, as such, in the discharge of official and public duties. They all involved either a question of taxation, property rights, or the legality of some official act, adjudicated by a former decision in favor of or against a predecessor in office. Those decisions simply determined the manner or method of discharging. official functions, or determined the question of the duty, liability or obligation resting on an incumbent in an office by reason of his official character. This is an absolutely different matter from the question of title to office, the thing determined in the Lawson case, and the thing for consideration here. Obviously a judgment against a public officer, as such, relating to a public right, duty, power, liability or obligation, attaching to the office, binds his successor, who, so far as he is affected by such determination, is properly regarded as in privity with his predecessors, deriving authority from the same source. In the case here, the rights of the respondents are to be determined, uncontrolled by the judgment in the Lawson case, because the subject-matter involved is not the same, nor are the parties the same; nor in respect to the matter there litigated can these respondents, in any sense, be said to be in privity with their predeces-

sors, who held under a different election and for a different term.

We have no dispute with counsel as to the correctness of the law announced in the authorities cited on the question of *res judicata*. The whole question is begged by the assumption of privity of title between these respondents and the relators in the Lawson case. Were there such privity, that would be an end to this litigation, but no privity in title exists between the parties who are affected, and it is therefore plain that this is not a case for the application of the principle of *res judicata*.

Most vigorous and exhaustive argument, highly instructive and persuasive in character, is urged for the application to the reasoning and conclusions in the Johnson case of the doctrine of *stare decisis*. We are not unmindful of the importance of this valuable and salutary principle, recognized in every land whose jurisprudence, like our own, rests largely upon precedent. Generally courts will adhere to a former decision, though found to be erroneous, where acquiesced in for a long time, and especially if it has become a rule of property. However, where vital public rights are involved, and a decision regarding them is to have a direct and permanent influence, it becomes not only the right, but the duty of a court to fully and carefully reconsider those questions, and permit no previous error to continue if it can be corrected. The rule of *stare decisis* rests upon the ground of public policy, and manifestly it would be grievous error to apply it where such application would result in more harm than good. While no mere doubt in the mind of the court, as to the soundness of a previous rule, will either require or permit of its review, it is equally clear that, if such decision is radically unsound, and serves no useful or wholesome purpose, but results

only in great and needless hardship, not contemplated by law, and where no serious results are likely to follow its reversal, then the rule of *stare decisis* does not, and should not be permitted to, interfere to prevent a reconsideration of the principle involved, or with a reversal of a doctrine formerly announced. Of the power of this court to overrule a previous decision, and of its right and duty to do so on proper occasion, there is no question.

In the case of *The Colorado Seminary v. Board of County Commissioners of Arapahoe County et al.,* reported in 30 Colo., page 507, opinion by Chief Justice Campbell, this court, speaking to the point now under consideration, said:

"This court has gone possibly as far as any appellate tribunal in maintaining the maxim *stare decisis.* The rule, however, is not inflexible, and the maxim should not be allowed to stand as an absolue bar in the way of a re-examination of legal questions previously decided by the same court, if improperly determined, and particularly where the decision reviewed has not passed into a settled rule of property. This is well illustrated in *Calhoun G. M. Co. v. Ajax G. M. Co.,* 27 Colo. 1, wherein this court overruled one of its former decisions upon an important question of mining law announced fourteen years before and repeatedly reaffirmed."

In *Calhoun G. M. Co. v. Ajax G. M. Co., supra,* this court, speaking through Mr. Justice Gabbert, to a like question, said:

"It is contended by counsel for appellee that the ruling in *Branagan v. Dulaney* and cases following it, is wrong, and that this question should now be reconsidered. In opposition to a reconsideration of the rights of cross-lode claimants, as declared by those cases, it is urged that the doctrine of *stare decisis* applies, and, even if wrong, should not now

be disturbed, because the rule therein announced has been established for such great length of time as to become a settled rule of property in this state. We are aware of the gravity of reversing a long-established precedent, and realize that it should not be disturbed except for the most cogent reasons; that the people of this commonwealth have a right to presume that, when a question has been once settled by this court, that its decision is correct and that all may rely upon it. We understand, generally, that when a decision has established a settled rule of property, upon which rights are predicated (and especially those relating to real estate), the law will be adhered to by the court announcing it, and those bound to follow its adjudications, even if erroneous (Black on Interpretation of Laws, § 152) ; but this rule is not inflexible. Courts are not bound to perpetuate errors merely upon the ground that a previous erroneous decision has been rendered on a given question. If it is wrong, it should not be continued, unless it has been so long the rule of action, and relied upon to such an extent, that greater injustice and injury will result by a reversal, though wrong, than to observe and follow it.—Black on Interpretation of Laws, *supra;* Sutherland's Stat. Constr., sec. 316; *Boon v. Bowers,* 30 Miss. 246.''

These two cases, in and of themselves alone, furnish abundant and conclusive authority upon this question. But upon the general proposition that appellate courts have the undoubted right to overrule former decisions, and should do so when they become convinced that such decisions are erroneous and work harmful results, there is a host of authorities. One of the leading cases to this proposition is that of *Ellison v. Georgia Railroad Co.,* reported in 87 Ga., page 691, where Chief Justice Bleckley, in a most unique and highly original opinion, had this

to say, all of which is particularly applicable to the case at bar:

"Some courts live by correcting the errors of others and adhering to their own. On these terms, courts of final review hold their existence, or those of them which are strictly and exclusively courts of review, without any original jurisdiction, and with no direct function but to find fault or see that none can be found. With these exalted tribunals, who live only to judge the judges, the rule of *stare decisis* is not only a canon of public good, but a law of self-preservation. At the peril of their lives they must discover error abroad and be discreetly blind to its commission at home. Were they as ready to correct themselves as others, they could no longer speak as absolute oracles of legal truth; the reason for their existence would disappear, and their destruction would speedily supervene. Nevertheless, without serious detriment to the public or peril to themselves, they can and do admit, now and then, with cautious reserve, that they have made a mistake. Their rigid dogma of infallibility allows of this much relaxation in favor of truth unwittingly forsaken. Indeed, reversion to truth in some rare instances is highly necessary to their permanent well-being. Though it is a temporary degradation from the type of judicial perfection, it has to be endured to keep the type itself respectable. Minor errors, even if quite obvious, or important errors, if their existence be fairly doubtful, may be adhered to and repeated indefinitely; but the only treatment for a great and glaring error affecting the current administration of justice in all courts of original jurisdiction, is to correct it. When an error of this magnitude, and which moves in so wide an orbit, competes with truth in the struggle for existence, the maxim for a supreme court, supreme in the

majesty of duty as well as in the majesty of power, is not *stare decisis,* but *fiat justitia ruat coelum."*

In the case of *Barden v. Northern Pacific Railroad Company,* 154 U. S. 288, the supreme court of the United States, speaking through Mr. Justice Field, upon this subject, said:

"It is more important that the court should be right upon later and more elaborate consideration of the cases, than consistent with previous declarations. Those doctrines only will eventually stand which bear the strictest examination and the test of experience."

To the same point, we refer to these additional authorities: *Allardt v. People,* 197 Ill. 501; *Board of Commissioners of Jackson County v. State,* 155 Ind. 604; *Pollock v. Farmers', etc., Co.,* 158 U. S. 601; *Paul et al. v. Davis,* 100 Ind. 422; *Kelly v. Rhoads,* 7 Wyo. 237; *Becker v. Superior Court,* 151 Cal. 313; *Law v. Smith,* 34 Utah 394; *Pratt v. Breckinridge,* 112 Ky. 1; *Robinson, Treasurer, v. Schenck,* 102 Ind. 307; *McCollum v. McConaughy,* 141 Ia. 172; 26 A. & E. Ency. Law, page 184, and authorities there cited.

With the foregoing suggestions in mind, the question is, whether, under the authorities relating to the doctrine of *stare decisis* and its application, this is a proper case for the employment of that rule. If the decision in the Johnson case is right in principle, it ought to stand; but plainly, if it is wrong in principle, it should be overruled, since it involves public questions of the highest import, having to do with governmental matters, touching efficiency and economy of administration, and directly affecting the general welfare of the people of the city and county of Denver, and indirectly of the entire state. It involves the construction of a constitutional provision which provides a form of government for the

people of that section, not only for to-day, but, it may be, permanently. It is a question of such vital moment that its importance can be neither overstated nor fully realized. The people of the whole state, by constitutional provision, so clear, so plain, so certain that it interprets itself, have provided that the duties in that territory, relating both to local affairs and governmental matters of state and county concern, shall be performed by a single set of officers who are to discharge double duties. This court, in the Johnson case, has declared that the will of the people, thus expressed, shall not be carried out, and that the constitutional mandate so providing may not be enforced. In other words, by that decision, the people are told that the policy declared is one which will not be recognized, and which the court will not allow to become effective, and thus the expressed will of the people has been ignored, set aside and denied recognition. It is said by that decision that the people will not be permitted to take the step purposed, although it has been held by this court in other cases that the adoption of article XX was a valid exercise of the power of the people to amend its constitution as it sees fit, and that such amendment is not in conflict with any federal provision. One argument in the Johnson case for declining to make effective section 2 of article XX, which, in itself, provides for perfectly legitimate and lawful acts, is that its enforcement is likely to be construed by the people into a permission to them to take unlawful and improper steps, at some future time—that is, go beyond the grant of power found in the article. It is not the function of this court to declare noneffective a clear provision of the constitution, because of the possibility that the people of the city and county of Denver may undertake to do some unauthorized act thereunder, of a purely imaginary, remote and

speculative character. A decision so founded is of
necessity unsound in principle, for the fair, just and
reasonable presumption is that the people will un-
dertake no such thing, but if they do, the means for
adequate protection and complete correction are im-
mediately at hand.

It is unnecessary for this court to say, to escape
the application of the doctrine of *stare decisis,*
that the decision in the Johnson case is obviously,
palpably and manifestly wrong; such bald state-
ments add nothing to the fact. In the discus-
sion as to the correctness of the reasoning of the
Johnson case, it has, we think, been demonstrated
that upon no theory can it be upheld. It is distinc-
tively and fundamentally wrong in that it declines to
recognize as effective and in operation a provision
of the state constitution, about the propriety and
meaning of which there is no room for two opin-
ions, and thus the court, in that case, by the strength
of judicial power, excludes that provision, although
it bespeaks a policy approved and adopted by the
whole people, whose exclusive and sovereign rights
and prerogatives, in that behalf, are thereby abro-
gated and thrust aside as if mythical and unreal.

There is absolutely nothing in the situation here
which persuasively appeals to the court for the ap-
plication of the doctrine of *stare decisis.* No rule
of property has been established by the decision in
the Johnson case, and no right of any one is affected
by its reversal, except, possibly, the mere oppor-
tunity, not a property right, to hold comparatively
unimportant public offices for a narrowly limited
space of time. On the other hand, the reasons are
many, and controlling, why the court should decline
its application. The reasons urged for the conclu-
sions in the Johnson case, which are made applica-
ble in all of the county officers' cases, are plainly

shown to be without merit. The judgments rendered upon that reasoning are wrong, with reference to the enforcement of a fundamental law, permanently affecting important governmental questions. If the constitutional provision now under review may not be made effective, to accomplish the results and purposes manifestly intended, then it may well be doubted whether such results and purposes can ever be obtained by any method at all. This indicates, in a measure at least, how far-reaching and how permanent in its evil effect the result in the Johnson case may prove if permitted to stand. Article XX is partially in force in the city and county of Denver, and has been since its adoption. As to one of its most important features, it is not in force, and out of this situation grows a conflict of interests, and a confusion of public duties and functions, resulting in a lame and feeble government, administered after a most expensive, inefficient and defective plan, inharmonious and unprecedented. This most unfortunate and distressing state of affairs, so hurtful in matters of great public concern, may be wholly relieved by simply holding section 2 of article XX in force and effect in its integrity, according to its plain meaning.

Much has been said in argument concerning the disturbance in public affairs likely to attend the overruling of the Johnson case. The utmost fear and anxiety have been expressed for the future well-being of the people of the territory directly involved, and direst forebodings are freely indulged, should its overthrow become an accomplished fact. Experience and observation establish that frequently, in human affairs, more eager solicitude comes from, and keener anxiety is occasioned by, the fear of anticipated events that never occur, than from those which actually do take place. Should the difficulties

suggested, or any of them, take tangible shape and be presented for judicial adjustment, they simply must be met and disposed of as they appear. For the present, at least, it is entirely sufficient to know and declare that the plain duty now confronts us of giving force to a clear and positive constitutional mandate, according to its undoubted meaning, in conformity with the intent and purpose of the whole people of the state, as thereby expressed, to the effect that there shall be in the city and county of Denver a consolidated government in fact, and that one set of officers shall discharge double duties therein, at one and the same time, including those which pertain to matters purely local, as well as those which have to do with governmental affairs of state and county.

We conclude, therefore, that the reasoning in the Johnson case ought not to stand. The judgment there entered is the law of the case; it remains undisturbed and is binding upon the parties thereto. We further conclude that, in the city and county of Denver, there are no county officers and can be no county officers, purely as such, and that the respondents are exercising the duties and functions of the pretended office of county commissioner without warrant of authority of constitutional or legislative law.

It is, therefore, considered and adjudged, that the respondents, George D. Curtice, Samuel D. C. Hays, Thomas Henry, John G. Prinzing and William P. Quarterman, are, and each of them is, guilty of unlawfully intruding into the pretended office of county commissioner, in and for the municipality known as the city and county of Denver, Colorado; that said respondents are, and each of them is, guilty of unlawfully exercising and attempting to exercise the supposed functions and duties incident to said

pretended office; that said respondents are, and each
of them be, and hereby is, ousted and excluded from
said pretended office, and from exercising or attempt-
ing to exercise the claimed and supposed functions
and duties incident thereto; and that they pay the
costs of this proceeding.

Decision *en banc.*

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE GAB-
BERT dissent.

Decided May 1, 1911; rehearing denied June 5,
1911.

_____

Mr. JUSTICE HILL, concurring specially: ·

It had not been my intention to give a written
expression of my views upon the very important
questions under consideration, but simply to concur
in the ultimate conclusions reached in the opinion of
Mr. Justice Bailey, holding that art. XX, in its en-
tirety, is a part of the constitution as announced
by the late Chief Justice Steele in the case of *The
People v. Sours,* 31 Colo. 369.

I am unable to appreciate or conceive wherein
the people, in their sovereign capacity, have not the
right to say that the power may be vested in the
people of the city and county of Denver, to desig-
nate the persons who shall perform the duties perti-
nent to certain local county offices, or wherein this
creates an unrepublican form of government. If
this cannot be done, I think the main objects and
purposes for which article XX was enacted are with-
out meaning and the whole amendment becomes a
farce. But, as I view it, it is possible and proper
to discriminate between a duty fixed by a general
law and the local agency by which that fixed duty
must be performed, and, in this respect, when ap-
plied to these local offices, in my opinion, the John-

son case and the other cases following it are not only in conflict with the Sours case, *supra,* and those following it, but are also radically wrong in their reasonings, which I think are based upon a false premise or structure, wherein it is assumed that certain things exist and that certain conclusions lead, irresistibly, to other conclusions, when the other conclusions are not properly deducible therefrom. In this connection it could be suggested that the Sours case says this article is valid; other cases following approve the Sours case, and in addition, say that this court should apply the meaning to it intended by the legislature consistent with the language used. Then comes the Johnson case, which says, while it is true we did say in the Sours case it is, yet it isn't. That this conflict in former opinions is apparent, to my mind is not debatable. However, it is not my purpose to enter upon a discussion of these questions, as I am perfectly content to rest my ultimate conclusions upon the dissenting opinions by the late Chief Justice Steele and Mr. Justice Gunter in the former cases, and the majority opinion in this case.

The object of these expressions is to take issue with the interpretation placed upon and the effect to be given the opinion of the writer in the case of *County Commissioners v. Lunney,* 46 Colo. 403, as given it by the present Chief Justice in his able dissenting opinion in this case, wherein he contends that the Johnson case has become a rule of property in this state, and wherein he says:

"Perhaps the most conspicuous instance where the doctrine of the Johnson case was enforced as a rule of property, is to be found in *County Commissioners v. Lunney,* 46 Colo. 403. The opinion was written by Mr. Justice Hill, who concurs in the majority opinion in the case at bar."

Referring to the facts pertaining to the Lunney

case, as affected by the Johnson case, among other things, he further says:

"When the regularly elected Board of County Commissioners, which was let into office as the result of that decision, took their seats, they reconsidered Lunney's claim and disallowed it. On appeal to the district court the board's action was overruled; but, on error, this court reversed the ruling and held, under the doctrine of the Johnson case and the other county officers' cases alluded to, that the new board was the legally elected and constitutional board of county commissioners, and had the right to disapprove and nullify the previous action of the supervisors. Our judgment could not have been as it was unless the Johnson case was followed. That it was again enforced in the Lunney case as a rule of property is too plain for argument. If the decision of the majority in the case at bar is right, the decision in the Lunney case was wrong. Mr. Lunney has lost his claim of over thirty thousand dollars, whereas, if the new doctrine of the present case had been enforced, Mr. Lunney would have got his money."

The opinion in the Lunney case will disclose that the *de jure* board (as decided in the case of *People ex rel. v. Stoddard*, 34 Colo. 200) only reconsidered the actions of the former board in allowing these claims pending an investigation and report therein called for, and that the matter was referred to the county attorney for the purpose of investigation and report in the interest of the taxpayers. This was the condition of matters when Mr. Lunney brought his suit, which was for the purpose of compelling the county commissioners, by mandamus, to issue to him warrants for the amount of his claims as previously allowed him by the former board. This court, in that opinion, held that where the bills

showed upon their face they were not in compliance
with the statute, that under such circumstances the
new board had the right to reconsider for the pur-
poses of investigation; we did not hold, that, were
the same circumstances presented concerning such
bills, and had the original board attempted a recon-
sideration for the same purpose, they could not
have done so, nor did we hold that had any succeed-
ing board, within the time limit that these matters
had transpired, attempted it, that they could not have
done so, or that a citizen could not have likewise pre-
vented payment of the illegal amounts.    None of
these questions was before us; neither was the ques-
tion of the soundness of the opinion in the Johnson
case raised, considered, discussed or decided in the
Lunney case.

I am unable to appreciate wherein the opinion
in the Lunney case, by its recognition of the exist-
ence of the Johnson case, and the results thereunder,
in any manner establishes a rule of property, even
against Mr. Lunney, when it did not cause a loss to
him of one dollar, nor even one cent, to which he
was lawfully entitled; at page 423 in the Lunney
opinion it is so shown in the following language:

''This action, upon the part of the board, did not
defeat any rights of the defendant in error, and was
not a refusal to pay any proper claim due him by the
county; it was his privilege then, as it is now, to have
presented to the regular board his bills properly
itemized in compliance with the statute, and in case
they were, or are, disallowed, he has his right to ap-
peal therefrom.''

Under this decision, as a matter of law, Mr.
Lunney was entitled to recover the greater portion
of his claim, and, while it is not a matter of record
here, yet I have every reason to believe that it was
so adjusted with him.

It was further held in the Lunney case that the board of supervisors, as well as the trial court, had misconceived the proper construction of the statute under which Mr. Lunney was employed, and upon which the right and the amount of his recovery depended. These were the only issues pertaining to his claim and the main question presented in his case. The recognition of the Johnson case was only an incident in connection with the various stages of the history of the Lunney contention and litigation; it was a recognition which had to be accepted for the reason that it referred to matters which had taken place under it in the past, and it was proper and right for a department of this court to accept its existence and adhere to its results until it was properly challenged, presented and overruled by a constitutional majority of the entire court.

In recognizing the existence of the facts and results brought about by the Johnson case and the county officers' cases, I take issue with the chief justice that it established a rule of property pertaining to Mr. Lunney in his case, or to any one else in any other case, or that it in any manner tended to cause a loss to him of any amount, to which he was entitled under the law as it exists, and as I think was properly construed by this court.

I also take issue with the position of the chief justice wherein he says: ''If the decision of the majority in the case at bar is right, the decision in the Lunney case was wrong.'' As I view it, if the Lunney case was yet to be decided after the opinion in this case becomes final, the result could not be different than it was, for the reason that under the Johnson case and the other county officers' cases following, a change was made in the personnel of the parties to perform the duties of those offices, and whether the reasonings which made these changes

were sound or otherwise, they were the final decisions in those cases and conclusive as to the individuals affected, but the official acts of all were binding either as the *de facto* or *de jure* boards during the periods they performed the duties thereof, and it was necessary in the Lunney case to take into consideration those facts and these changed conditions as they actually existed and had been brought about by the result of these decisions; but, if the Lunney case was yet to be decided, it would likewise be necessary to take into consideration the same state of facts as was shown to exist at that time, as these facts would not and could not be different than they then were even after the decision in this case becomes final.

---

CHIEF JUSTICE CAMPBELL, dissenting:

1.   In concluding to take original jurisdiction of this proceeding this court has departed from its established practice repeatedly announced in many cases.  The majority opinion is silent upon the subject and offers no reason for the unprecedented action.  What are we solicited to do?  The learned attorney general, who appears as relator, says that in some of its previous decisions, not citing them, this court has not permitted the people of Denver fully to realize all the purposes which article XX of our constitution was intended to accomplish, and that leading commercial bodies and kindred organizations are under the conviction that such decisions were erroneously made, and that reconsideration thereof should now be had to the end that but one set of officers, instead of two, may be installed in the new public organization which article XX created, and that greater economy of administration and more satisfactory results may be attained than un-

der the existing regime. The names of these dissat-
isfied bodies are not furnished, but apparently their
arguments were sufficiently cogent to induce the de-
sired action, and it seems that though the petition
does not reveal their identity, the appeal to their dis-
cretion has lead the majority of the court to comply
with the request. The court has thereby committed
itself to an assumption of a jurisdiction which, even
in the proper class of cases, is sparingly exercised,
and should be asserted only when the question pre-
sented for determination is *publici juris*—one affect-
ing the people of the entire state—and never where
only a city or county is interested. Up to the pres-
ent writing this tribunal is still the supreme court of
the entire State of Colorado, not merely of one part,
and, in exercising its original jurisdiction, should
confine itself to questions that affect the whole body
of our people. The crowded condition of our docket
calls for our diligent attention in disposing of de-
layed causes on review, which is our first duty, since
this court was constituted primarily to review judg-
ments of inferior tribunals. This circumstance of
itself forbids the exercise of our extraordinary, pre-
rogative, original jurisdiction, particularly where, as
here, we are asked to reconsider a question thor-
oughly argued and decided by this court in a closely
contested real cause, which has been followed in at
least twenty other cases. It is no reflection upon the
character or respectability of these distinguished
bodies to say that they might not have fully appre-
hended the nature of their request, or accurately
measured the complications that will inevitably en-
sue if it be favorably considered. If, hereafter, the
Anti-saloon League of Fountain should petition this
court to reconsider one of its former decisions upon
the local option law which the league thinks would
permit open saloons in that town, or if the Liquor

Dealers' Association of Fairplay should invoke our original jurisdiction to reconsider another of its former decisions which the association anticipates might close saloons in that town, this case could be cited as a precedent, though the probability is that this court would not so quickly respond with the desired writ. And yet, the principle, that is the basis of the rule, is precisely the same in the supposed cases and in the case at bar. Though Fountain and Fairplay are small towns, their local affairs are just as important to their citizens as are the local affairs of Denver to its citizens, and their material interests are just as important to the designated town organizations as are the material interests of the leading bodies of Denver to their members. The minority protests as earnestly as it can against this procedure, which, if followed as a precedent, will divert the attention of the court from its primary work as a court of review and still further impede the despatch of its unavoidable business, to the prejudice of private litigants and other and less importunate bodies and municipalities.

2. Before entering upon a discussion of the grave legal propositions involved, it is fitting to advert to the astonishing statement made at the beginning of the majority opinion, that "Under the issues herein only the soundness of the reasoning, upon which the conclusion in the Johnson case was reached, is challenged," and the further one that while, in that case, the right of the Denver charter to provide for two persons instead of one to discharge the duties of county judge was involved, "the decision was not based upon the ground that that could not be lawfully done, nor will that question be now considered or decided." Are not such statements pregnant with the admission, at least entirely consistent with the concession, that the Johnson case

was rightly decided upon principle, but that the reasoning in which the court indulged was faulty? In harmony with this preliminary statement, the opinion throughout contains not even a mild intimation that the Johnson case was erroneously decided, but it is altogether devoted to an attempt to show defects in the reasoning. An appellate court, even upon appeal or error, does not concern itself with the reasoning of the trial court if its judgment is right. It is indefensible for the highest judicial tribunal of the state to permit its prerogative jurisdiction to be invoked merely to review and set aside the *reasoning* of one of its former decisions, when the case itself was rightly decided. In this connection we only add that it is inconceivable how the learned judge brought himself to say that this court in the Johnson case did not hold the charter attempt unlawful. The reasoning there employed to show that it was unlawful may not, to his mind, be sound, but there can be no doubt that the court held the attempt to be not merely unlawful, but inhibited by the federal constitution, the supreme law of the land.

3. Coming now to the opinion, let it be admitted that its author has made the most plausible argument thus far advanced to uphold the proposition that article XX confers upon the public corporation known as the city and county of Denver the power to override every other conflicting article of the same instrument which bears not only upon local, but also upon county and state, government, so far as the particular territory is concerned, and to nullify the provision of the federal constitution which guarantees to every state a republican form of government. No attempt to gild its baldness, or to soften its effect, can minimize the unbridled power which the opinion gives to the city and county of Denver. The learned justice avowedly adopts the reasoning con-

tained in the dissenting opinions of Mr. Justice Steele in the Johnson case, and of Mr. Justice Gunter in the Horan case, and says that their unanswerable arguments obviate the necessity of a more extended argument by him to support the views of the present majority, which, at considerable length, he proceeds to unfold. Were it not that, as will be conclusively shown later, the present majority really repudiates vital parts of such reasoning, the very reasoning, indeed, on which the dissent of the former justices was based, and takes a long step in advance and for the first time promulgates a new doctrine, which removes all barriers between the good people of Denver and the state constitution, the present minority would content itself by referring, with full approval, to the logical, temperate, and comprehensive opinion of Mr. Justice Maxwell in the cases mentioned, which reflected the views of the majority of the court as then constituted, of which we were a part. Mindful of the implication in the opinion that the Johnson case ruthlessly set aside the policy of the people declared in article XX, and of other similar statements, and aware of the positive assertions that section 2 is so plain that it interprets itself, though many pages are devoted to its exposition, and that there is no room for two opinions about its propriety and meaning, we shall treat these expressions as fervent rhetoric and enter upon the discussion as though the matter was not entirely foreclosed for us and was not so intended by the fair-minded writer of the opinion.

Counsel for petitioner admit that article XX is *sui generis*—is wholly unlike anything in the history of constitutional or legislative enactment, and no authority of any court can furnish any aid whatever in its construction. This concession makes useless an argument here to show the inapplicability of

the Missouri and California decisions on the constitutional provisions relating to the municipal governments of St. Louis, in the former state, and San Francisco in the latter, which have heretofore been largely relied on by previous counsel and the previous minority of this court in support of their conclusions. Without the concession, however, Judge Dixon, in behalf of respondents, in his brief and in oral argument, has conclusively demonstrated that in Missouri the different systems of law applicable there must receive the sanction of the entire people of the state, or by one legislative body directly representing them, before any municipal or county charter or ordinance becomes effective; while, under the California scheme, no legislation upon any governmental matter contained in the city charter of San Francisco, or relating to any city or county, can become a law by virtue of a favorable vote thereon merely by the qualified electors thereof, but only after its adoption by the legislature of the state, which represents the entire people of the commonwealth, does it have any force whatever.

In a later and separate discussion it will appear that, for our present purpose, it is not important whether the reasoning of the Johnson opinion, or the decision itself, is sound; but, at the risk of repetition of arguments made in the opinions in other cases—which repetition is unavoidable, also, under the different branches of this opinion—it is fitting that, as briefly as may be, some of the many reasons for its doctrine that suggest themselves be now stated.

No citation of authorities is made or abstract reasoning employed to establish the point that the latest amendment to a constitution on a particular subject prevails, in case a conflict, over those of an earlier date upon the general subject which includes

the particular. We admit the doctrine. It would be true as to article XX, even in the absence of section 8 thereof, which reads: "Anything in the constitution of this state in conflict or inconsistent with the provisions of this amendment is hereby declared to be inapplicable to the matters and things by this amendment covered and provided for." Learned counsel for petitioner concede that these words add nothing to what the law would be without them. The pertinency of this principle, as announced and as applied to this case in the majority opinion, is, however, not apparent. And this is so because, as we now proceed to demonstrate, and as heretofore has always been declared by this court, article XX was intended merely to furnish a system of home rule for Denver and other cities, exclusively applicable to their local or municipal matters. Other amendments to the constitution were submitted, at the same time, on other and different subjects, namely, county and state government. The same legislature that proposed article XX took similar action upon other amendments. Among them was one which relates to district attorneys and county judges; another to county commissioners and other county officers. These two amendments, prepared by Senator Taylor, an experienced constitutional lawyer, were passed by the general assembly (Session Laws 1901, pages 110 and 112) at a later date than article XX, and the members of that body voting for them were aware of their previous action upon article XX. It is not to be supposed that the general assembly, at the same session, intended to submit for the adoption of the people at the same election, constitutional amendments that would nullify, and be irreconcilably repugnant to, each other; but, if the majority opinion is right, that is exactly what it did. These three amendments were adopted by the people at the same election.

They took effect at the same time. Each is of equal rank with the others. Each one relates to a subject of legislation separate and distinct from that of the others. One of them—article XX—relates solely to local or municipal government, another to the subject of district attorneys and county judges, another to county commissioners and other county officers. The second one prescribes the duties and qualifications, and fixes the terms of office of district attorneys and county judges, and declares that they must be elected at the general state election in November, and similar provisions are in the third amendment. These three amendments are absolutely and irreconcilably repugnant, if article XX has the import which the majority opinion gives it, for thereby all county offices and officers are abolished and the officers to be designated by the charter, that may be adopted under the authority of article XX, are to be elected at a different time, and their qualifications, duties and jurisdiction are, or may be, different from those prescribed in the other two amendments. The amendment as to county commissioners expressly provides that, in counties having a population of 70,000 or over, the board of commissioners may consist of five members. At that time, and now, Denver County is the only county in the state which has that, or a larger, population. It is altogether clear that the framers of this amendment and the general assembly which submitted, and the people who, by their vote, adopted it, intended to continue the existence of a board of county commissioners and all other county offices in Denver County, and it is equally apparent from these various amendments that it was the intention that local or municipal government in the new county should remain intact and distinct from county and state government. Statutes passed at this and subsequent ses-

sions also clearly recognize this. The only way to avoid the repugnance, as pointed out, is to continue the construction of article XX, which was made in the Sours and Johnson cases, and followed by at least twenty others, and restrict it, as has always hitherto been done, to the local or municipal affairs of the new municipality.

Stress, in the petition, is laid on the alleged fact that economy will result by having only one set of officers in Denver. If that be true—and economy of administration is a desideratum in every government—it has no bearing on the construction of a written instrument. There is no proof at all in this record of the assertion. On the contrary, if the statement of Mr. Hersey, in his reply brief, is true, and its accuracy is not disputed, when the affairs of Denver were so conducted, under the charter requirements, no advantages on the score of economy over the double set of officers were achieved. But if a more economical administration may be enjoyed by having only one set of officers to perform both city and county functions, it may easily be secured by the adoption of a charter which designates duly elected county officers to perform local or municipal, as well as county and state functions. This ought to be done, for in that way, and no other, can article XX be construed so as to make it valid under the federal compact. By permission of the state, which article XX embodies, but if not, then by permission of the general assembly, it is entirely competent to impose municipal duties upon state or county officers; but it is not permissible, even by constitutional amendment, for the state to abolish state and county offices and officers and devolve the duties thereof upon merely municipal officers over whom the state has no control whatever, the majority opinion to the contrary notwithstanding.

Perceiving the force of the argument, as to the effect of submitting different amendments at the same time, as made by Justice Maxwell in *People v. Horan,* 34 Colo. 304, the dissenting opinion there falls back upon the following sentence at the close of each section of the Taylor amendment upon the subject of county officers: "This section shall govern, except as hereafter otherwise expressly directed or permitted by constitutional enactment." It is to be observed that no such language is in Senator Taylor's amendment concerning district attorneys and county judges, and that article XX is just as repugnant to this amendment as to the one relating to county officers. But this language in the Taylor amendment above quoted does not make the law different from what it would otherwise be. We have already seen that the similar language of section 8 of article XX adds nothing to the pertinent law, and for the same reasons these words in the Taylor amendment do not affect the law thereof so far as it concerns conflicting constitutional provisions. Moreover, it is significant that the provision is that the section governs "except as *hereafter* otherwise *expressly* directed or permitted by constitutional enactment." In the dissenting opinion in the Horan case it was said that section 8 of article XX was intended to apply only to *pre-existing* conflicting provisions of the constitution. The language above quoted from the Taylor amendment, relating to county officers, was not intended to make that amendment subject to article XX, which relates merely to home rule for cities; and if such had been the intention, it was easy to say so. The two amendments, born at the same time, were upon entirely different subjects, one concerning municipal, the other county and state, government. Article XX is not later than the Taylor amendment; it does not even *expressly*

direct or permit any of its provisions to override the
Taylor amendment. Indeed, the two Taylor amend-
ments are the very latest enactments upon the sub-
jects of district and county offices, and, according to
the conclusion of the majority opinion, they over-
ride all previous constitutional provisions in so far
as there is any conflict. Therefore, there is no pos-
sible ground for saying that the Taylor amendment
must yield to article XX on the hypothesis that the
latter is a subsequent "enactment." We repeat that
these amendments, according to the majority opinion
as to the scope of article XX, are irreconcilable. In
no way may they be reconciled and all given full
effect except by construing article XX, as was done
in the Johnson case, and in twenty of more subse-
quent cases, as applicable merely to local or munic-
ipal, in contradistinction to county and state affairs.

The opinion says all that article XX purports to
do relative to county offices and officers, is to provide
that the people of the city and county of Denver,
through their charter, shall designate the "agencies"
which are to discharge these several respective duties
and functions. The implication is that this is a mat-
ter of no moment, merely a comparatively trivial
thing. With such interpretation or construction the
court says it contains a valid delegation of power.
Let us analyze section 2, which reads: "The officers
of the city and county of Denver shall be such as by
appointment or election may be provided for by the
charter; and the jurisdiction, term of office, duties
and qualifications of all such officers shall be such
as in the charter may be provided; but every charter
shall designate the officers who shall, respectively,
perform the acts and duties required of county of-
ficers to be done by the constitution or by the gen-
eral law, as far as applicable." It will be conceded
that when the charter designates the "agencies" to

discharge governmental duties they come within the general designation of "officers of the city and county" mentioned in the first line of the section. If so, the charter may not only fix their term of office, the time of their election and their salaries, which it has already attempted to do, but may also define their jurisdiction and prescribe their duties and qualifications. If such power has been conferred, it is absolute, not qualified, for there is no reservation or limitation accompanying the grant. All supervision by the state is gone, no right of approval of the charter is left to the people of the whole state acting through the general assembly or by their direct vote. True, the majority opinion says that article XX does not invest the people of Denver with power by charter "to in any way change the duties of governmental officers, so far as they relate to state and county affairs." By the same process of reasoning, this conclusion applies equally to "the jurisdiction, term of office,  *  *  *  and qualifications of all such officers," since all these things are mentioned in section 2 as being proper subjects of legislation in the charter. If, as the majority opinion says, the charter has nothing to do with governmental duties of a county and state officer, how can it have power to fix his term of office, or salary, or define his jurisdiction, or say when and how he shall be elected? The answer must be that the power exists as to none of them. If the power to legislate as to one is lacking, it is lacking as to all. It is idle to say that the power by charter to fix or change the term of office or the salary of a county or state officer, or the time of his election, or so to legislate as to some "agency" named by the charter to discharge the governmental duties of such county or state office, is not legislating with respect to county and governmental affairs. It is just as much legislating con-

cerning governmental affairs as would be an act pre-
scribing the duties, qualifications and jurisdiction of
such officers. It is clearly beyond the power of the
state, as said by Mr. Justice Steele in the Sours case,
even by constitutional amendment, to strip itself of
legislative control over county and state officers, and
to delegate to any portion of the state, less than the
whole, the sovereign legislative power to perform its
full duties to all its inhabitants concerning govern-
mental, as distinguished from municipal, matters.
For to do so would be for the state to disable itself
to secure and maintain a republican form of govern-
ment, which it is bound to maintain by the supreme
federal authority. It is no answer to say that the
state has not improperly delegated such powers, and
thus abandoned its sovereignty, that the same people
who adopted article XX may repeal it and thus re-
possess themselves of what was parted with. For
until it does so, the illegal grant is being exercised
and illegal governmental action is being exerted.

And right here it is pertinent to point out a mis-
conception in the opinion. It refuses to apply the
familiar rule for the test of the constitutionality of
a statute, which is equally germane when an amend-
ment to a state constitution is assailed as being in
conflict with the federal supreme law. That test is
"not what has been done, but what, by its authority,
may be done, under it."—*Ames v. People*, 26 Colo.
83. The court closes its eyes to the fact that section
2 expressly authorizes a charter which shall provide
for the jurisdiction, duties, term of office and qual-
ifications of all its officers, municipal and other, if
any, and because the present charter has gone only
to the extent of fixing the term of office, time of elec-
tion and salaries of the "agencies" designated to
perform county and state governmental duties, which
is said not to be inhibited, the court refuses now to

decide whether section 2 is a valid delegation of power, though, on its face, it authorizes a charter which may prescribe the duties of all its officers or "agencies," and bases that refusal on the ground that no such charter has, as yet, been enacted, even though the attempted delegation be invalid as evading the federal compact. It says .that the court should not anticipate that such unwarranted action will be taken, and that it will wait until the concrete question is presented before passing upon it. We know of no sanction in the law that will excuse the performance of judicial duty in a case like this. It is not a question whether the people of Denver will, or will not, transgress the supreme law of the land. It is whether section 2 attempts to give them unrestricted authority to legislate unlawfully if they see fit to do so. If such a legal delegation of power is embodied in section 2, this court ought to say so now. The section is invalid, as inhibited by the federal compact, if it takes from the sovereign state power to insure a republican form of government, even though the municipality of Denver never takes a single step in the exercise of the inhibited authority. If the general assembly should, by statute, purport to grant to municipalities a power which, on its face, clearly authorizes them to adopt an unconstitutional charter and ordinances, would this court, when the authority was properly challenged, decline to say so on the ground that the same had not been fully exercised?

4.   To one who has carefully studied the decisions of this court in the many controversies growing out of article XX, ranging from *People v. Sours*, 31 Colo. 369, to *County Commissioners v. Lunney*, 46 Colo. 403, the new departure taken in the majority opinion will come as a surprise. In no previous case has it been held that article XX expressly, or

at all, abolished county offices in Denver County. In every opinion hitherto written it has been conceded that county offices in Denver County exist the same as in every other county in the state, the only dispute among the judges being as to the manner of filling them. But now this court, for the first time, has committed itself to a new construction and held that article XX, in effect, has abolished every county office in Denver County. True the opinion, in one or more places, says that it has abolished county offices "as such," "purely as such." In other places these phrases are omitted. "Purely as such" is meaningless. At all events, what it signifies the court has not taken the trouble to explain. Either county offices exist, or they do not exist—they are not in a state of suspended animation. As we view it, the court discreetly let the subject rest without explanation, for "purely as such" in no sense qualifies the bold and startling declaration that county offices ceased to exist in Denver County in 1902 when article XX was adopted. This article certainly has not expressly abolished them. Section 3 ends the *term* of all officers of the former county of Arapahoe, and expressly provides that certain designated *county* officers shall hold their (county) offices "until their successors are elected and qualified," thereby clearly recognizing that county offices in Denver County existed and were to be filled by elections. But neither that nor any other section purports to abolish a single county office in the new county of Denver. Just how or why, or by what provision of the article, county offices are wiped out, we are not advised. It is apparent, however, that the present majority conceived that, unless such a conclusion was reached, they had no ground at all for impeaching the reasoning in the Johnson opinion, and, while they say they adopt the reasoning of the dissenting

opinion in that case, it is respectfully submitted that they do not, for that was based upon the assumption that county offices exist in the new the same as in all other counties of the state, but that they are to be filled and their duties discharged by "agencies" which the charter may designate, and not necessarily as the constitution and general laws declare.

Let the logic of the new doctrine be tested. In our scheme of government, old or new, counties are an essential part of the necessary machinery of government to enable the state to discharge its own state functions, as well as to comply with the federal compact. As we understand it, that is admitted in the opinion; at least is not denied. A county without officers is unthinkable. If the organization has no offices, it is not a county. To discharge the functions of a county the organization must have county officers and all the necessary political machinery to perform its governmental duties. If, as the majority opinion says, it has no county office or officer, there certainly is no existing method by which the organized territory embraced within its territorial limits can fulfill governmental functions, either for itself or for the state, whose creature it is. And even if section 2 permits the Denver charter to designate the "agencies" which shall perform the duties required of county officers, this necessarily presupposes the existence intact of the county offices whose duties such "agencies" are to perform. It is impossible to conceive how "agencies" can be designated by the charter to discharge governmental duties of county officers of Denver County, if, as the majority opinion says, Denver County has no county office or officer. Though we have no light from the opinion on the point, it will not answer to say that this objection may be overcome by construing article XX as conferring upon Denver County the

power to establish for itself county offices as well as to fill them. No such authority is to be found in article XX, and we apprehend it would scarcely be contended that it is to be implied from any express grant contained in it. Besides, this confessedly would be legislating strictly and directly, not incidentally, on the subject of county and state government, which even the opinion asserts is not within the contemplation of article XX. It is equally apparent that it would be an attempted delegation of the sovereign legislative power by the entire state to a subordinate subdivision, which no one has hitherto been rash enough to intimate even a constitutional amendment may do.

But if the new doctrine of the majority can, by any process of artificial reasoning, be established, it ought not to be declared even to give it the limitless power asserted, if there is any reasonable ground to escape it. If Denver County has no county offices now, it has never had them since article XX took effect in 1902. If that is so, then it necessarily follows that every act is absolutely void which has been done by every supposed county officer of Denver after July 10, 1905, when, under the decision of this court, various county officers elected by the people were let into the enjoyment of their offices. From that time down to the present moment, every valuation of property for taxation, every dollar of tax collected, every tax sale, every act of recording a deed, every marriage license, every arrest, every execution sale, every levy of a tax, every contract in behalf of the new county by supposed county officers of Denver, is void, not merely voidable. Such acts were not done under color of office or by *de facto* officers. These supposed officers are liable in damages to every person affected by their acts, and no right can spring therefrom. In *Butler v. Phillips,* 38

Colo. 378, this court held that, so far as they concern the public or third persons, the acts of Judge Johnson, who theretofore had been ousted from the office of county judge by decision of this court in the Johnson case, were the acts of a *de facto* public officer, and therefore valid; but the decision was planted squarely upon the proposition that Judge Johnson was a *de facto* officer and that his acts were valid because, during his incumbency, he was discharging the duties of a legally existing office. In the course of the opinion, at pages 388 and 389, certain decisions of the courts were adverted to, which, among other things, held that "officers filling offices created by unconstitutional laws are  *  *  *  *  *  *de facto* officers, until, under direct proceedings, the act had been declared unconstitutional." The court proceed to say that this and other such decisions are in conflict with the great weight of authority in this country. However that may be, all the authorities hold that there can be no *de facto* officer unless there is a corresponding office in existence, and that a person assuming to hold an office which has been abolished cannot be an officer *de facto*.—8 Am. & Eng. Enc. of Law, p. 799 *et seq.*

The various acts which have been performed by the supposed county officers in Denver for more than five years last past give rise to other questions than the mere right or title of the incumbents. The property rights of many individuals have been affected. Involuntary contributions in the way of taxes have been levied and collected of property owners. Persons have been arrested by a supposed sheriff and restrained by him of their liberty. Decisions of Judge Johnson of the county court, which, in the Phillips case, this court held valid so far as his acts affected third persons and the public, are now nulli-

fied, as to all other persons except Phillips, by the decision of the court in this case. This being true, people who are injuriously affected by the acts of these officers may properly raise the question that they have been deprived of their property without due process of law. This court, of course, might overrule its own former decisions, and, in a new pronouncement, try to validate such acts; but the federal courts will not be governed by state decisions on a question like this, for a federal question is involved. The United States supreme court, in a number of cases, has spoken in no uncertain words upon the point we are now considering. In *Norton v. Shelby County,* 118 U. S. 425, the court, speaking by that distinguished jurist Mr. Justice Field, said, in the course of the opinion, at page 441, in reply to a contention made by counsel, "This contention is met by the fact that there can be no officer, either *de jure* or *de facto,* if there be no office to fill   *   * * The doctrine which gives validity to acts of officers *de facto,* whatever defects there may be in the legality of their appointment or election, is founded upon considerations of policy and necessity, for the protection of the public and individuals whose interests may be affected thereby   *   *   * But the idea of an officer implies the existence of an office which he holds. It would be a misapplication of terms to call one an officer who holds no office, and a public office can exist only by force of law." In answer to the proposition that one who assumes to act as an officer under an unconstitutional law is a *de facto* officer till it is judicially declared to be so, the learned justice said: "An unconstitutional act is not a law; it confers no rights; it imposes no duties, it affords no protection; it creates no office, it is, in legal contemplation, as inoperative as though it had never been passed." The entire opin-

ion is instructive, and in concluding the subject the court, in reply to the contention that various cases have held to the contrary, said: "None of them sanctions the doctrine that there can be a *de facto* office under a constitutional government, and that the acts of the incumbent are entitled to consideration as valid acts of a *de facto* officer." And further on he says: "None of the cases cited militates against the doctrine that, for the existence of a *de facto* officer, there must be an office *de jure,* although there may be loose expressions in some of the opinions, not called for by the facts, seemingly against this view. Where no office legally exists, the pretended officer is merely a usurper, to whose acts no validity can be attached." This is the settled doctrine of the federal courts.—*McDowell v. United States,* 159 U. S. 596. And it has been followed with approval by this court in *Gorman v. People,* 17 Colo. 596. Chief Justice Hayt, after adverting to the general rule that public policy frequently prohibits the questioning of official acts of an incumbent of an existing office said: "But this rule presupposes the existence of an office *de jure.* There is no principle of law under which a *de facto* court can be sustained." And he cites the Norton case, *supra,* as so deciding. Many cases to the same effect might be cited, but our own cases and the authority of the supreme court of the United States are sufficient to warrant the statement that, under a constitutional government, where there is no office *de jure*—that is, no existing office—there can be no *de facto* officer, and the acts of the one who purports to be such are of no validity whatsoever. To be sure this rule does not obtain when the constitutional government is destroyed by revolution. But we are not engaged in an academic discussion as to what might be the situation where the reign of constitution and laws is no longer recog-

nized. Let it be remembered that during these five years the persons who have supposed that, under the decision in the Johnson case, they were legal county officers of Denver County and performing the duties thereof, were elected by the people as county officers under the general laws and constitution of the state applicable thereto. They do not claim any title or right under any provision of the Denver charter, but what rights, if any they have, are antagonistic thereto. This court has now held that during these five years there were no county offices in Denver County—of course, "purely as such"; but, as we have seen, this is meaningless. This holding overrules the decision in the *Phillips* case and makes all of Judge Johnson's acts as judge of the county court, and those of every other county judge since elected, absolutely void, and stamps with the same disapproval every act of every supposed county officer of the City of Denver that has been done during the five years. If this holding may not introduce chaos and give rise to numerous law suits and inflict great hardships upon innocent citizens and involve county and state government in Denver County in inextricable confusion, it would be hard to say what would bring about such result. *Ab inconvenienti,* of course, is to be ignored, if to a given conclusion inexorable logic and sound principle lead. And if the purging of our reports of limping logic is a judicial duty paramount to the obligation of adhering to *stare decisis,* possibly the disastrous results to follow in the wake of the present pronouncement should be welcomed as ministering to the higher law.

5. Respondents have entered pleas of *res adjudicata* and *stare decisis.* It is elemental that when these principles apply, it is a matter of no importance

if the judgments relied on are erroneous. These in their order.

In *People ex rel. Lawson v. Stoddard et al.*, 34 Colo. 200, the precise questions herein involved were determined by this court adversely to the contention of the petitioner. It was there held that the charter provision which designates the board of supervisors of the city of Denver as a board of county commissioners of Denver County is invalid, and that county commissioners of Denver County, elected at the general state election in November, constitute its county board. In accordance with that ruling this court ousted the supervisors, who were then in possession of the office, and put therein persons so elected as county commissioners. In that proceeding the people of the State of Colorado was the party petitioner, just as the same people is the party petitioner here. By its legal representative there the people sought and obtained a decree declaring that there existed in Denver County the office of county commissioners, and that the commissioners, elected as the constitution and general laws provide, constitute the only legal board. Here the same people as petitioner, by its legal representative, seeks, and has obtained, a pronouncement of this court directly to the contrary. Not only common sense, but law, says the people should be estopped by the former decree to prosecute the pending suit. The first judgment is *res adjudicata* as to the people, as the following, among other authorities, declare: 20 Enc. Pl. & Pr., 588; 26 Am. & Eng. Enc. of Law (2nd ed.), 485; 24 Am. & Eng. Enc. of Law (2nd ed.), 755; *State v. Kennedy*, 60 Neb. 300; 7th Com. Dig., Title Quo Warranto, 201; 3 Blackstone Commentaries, 263; *Holsworth v. O'Chander*, 49 Nev. 44; *New Orleans v. Citizens' Bank*, 167 U. S. 371; *State v. Board of County Commissioners*, 162 Ind. 580; *Wheeler v.*

*City of Aberdeen et al.*, 45 Wash. 63; *Minnesota Company v. National Company*, 3 Wall. 332; *City of Denver v. Lobenstein*, 3 Colo. 216; *Bartlett v. O'Mahoney*, 47 Colo. 237; *Starr v. Chicago R. I. & P. Ry. Co.*, 110 Fed. 3; *Prout v. Starr*, 188 U. S. 537; 23 Cyc. 1270; *Keller v. City of Mt. Vernon*, 48 New York (Sup.) 370; 23 Cyc. 1292.

The state is not obliged to submit itself to the jurisdiction of its own courts, but when it voluntarily does so, and without reservation tenders a controversy for judicial determination, it is as much bound thereby as is a private party in the same circumstances. Blackstone says: "A judgment on a writ of *quo warranto*, being in the nature of a writ of right, is final and conclusive, even as against the Crown." To the same effect is the decision of the supreme court of Nebraska in the Kennedy case, *supra*, which is also authority for the general conclusion we have reached on this branch of the case. The present Chief Justice White of the supreme court of the United States, in *New Orleans v. Citizens' Bank, supra*, says: "The very essence of judicial power is that when a matter is once ascertained and determined, it is forever concluded when it arises again under the same circumstances and conditions between parties or their privies," * * * and that "The mere fact that there has been a change in the person holding the office does not destroy the effect of the thing adjudged.'" In the Indiana case it was said, "A judgment estoppel in a case where an officer is a party, operates upon the office. The successor is in privity with his predecessor." In the Minnesota Manufacturing case, in 3d Wallace, the court well said: "Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change. Parties should not be encouraged to speculate on a

change of the law when the administrators of it are changed. Courts ought not to be compelled to bear the infliction of repeated arguments by obstinate litigants, challenging the justice of their well-considered and solemn judgments." And the same court also said: "There would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate on chances from changes in its members." In *City of Denver v. Lobenstein, supra,* Chief Justice Thatcher, in perspicuous language, thus announced the doctrine: "It is held to be a 'principle lying at the foundation of all well-conducted jurisprudence, that when a *right* or a fact has been judicially determined by a court of competent jurisdiction, the judgment thereon, so long as it remains unreversed, shall be conclusive upon the parties, and those in privity with them in law or estate'."—23 Cyc. 1270. These excerpts from leading authorities are particularly applicable to the facts of this case and fully sustain the plea of *res adjudicata.*

But the majority opinion summarily disposes of this point by saying that there is no privity of title between these respondents and the relators in the Lawson case, and adds that if there were such privity, that would be an end to this litigation. The first statement is predicated upon another statement, that the relators in the Lawson case held under a different election from that on which respondents' title here rests, and that the subject-matter of the litigation in the two cases is not the same, and the parties, nominally at least, are different. Let this contention be subjected to analysis. Lawson and the other relators, and the respondents here, derive their title from the same ultimate source, namely, the constitution and general laws of the state, while respondents in the Lawson case based

their title upon the conflicting provisions of the Denver charter. Respondents here and relators in the Lawson case, since they derive their title from the same source, are privies in law, notwithstanding they hold under different elections, in so far as concerns the duties, qualifications, term of office, and its rights and privileges. It is and must be conceded that if the office of county commissioner exists in Denver County and is to be filled at the November state election, relators in the Lawson case were, and respondents in this case are, entitled to possession thereof. On the other hand, if the city charter provision legally makes the city supervisors the board of county commissioners of Denver County, they, and not the successful candidates at the state election, constitute the board. There is no claim that respondents were not duly elected. Nor is there any controversy between the Lawson relators and the respondents here of any character whatever. Both contend for the some propositions, namely, that the successful candidates at the general election make up the county board. In the Lawson case there was no dispute as to the facts; neither is there here. Neither there nor here is the controversy one as to which rival candidates were elected at the same election. The facts were admitted, and the questions at issue, and the ones determined in the former case, were questions of law. It will not do to say that mere abstract principles of law may not be the subject of litigation. That was a concrete case that was before the court, and certain legal conclusions were reached, certain *rights* established. A determination of a court—the facts being admitted —is nothing but a determination of the law as applied to the facts, the very rights of the parties thereby adjudicated. A ruling on a general demurrer, on the merits, raising only an issue of law, is

available as a plea of *res adjudicata* as completely as is a determination on the facts.—23 Cyc.1232. Precisely the same facts on which the former adjudication was made are present here. These legal questions were, first, whether county offices still exist in Denver County since the adoption of article XX, and whether the constitution and general laws relating to county offices and county officers were paramount or subordinate to special article XX and the charter provisions on that subject. If the general laws are paramount, the relators in the Lawson case rightly prevailed. If subordinate, respondents there ought to have succeeded. Is it not conclusive that precisely the same material facts and the same legal questions are here involved, and the same rights determined, and is not the real object of the pending proceeding to obtain a ruling which not merely sets aside the reasoning of the Johnson case, on which the Lawson case was founded, but in effect overruling that case and declaring that all county offices of Denver County are abolished, and that the city supervisors are entitled to act as a board of county commissioners? It is, to borrow the expression of the majority opinion, "a begging of the question" to say that the subject-matter of the Lawson case is different from the subject-matter here.

But, says the opinion, "there is no privity between the Lawson relators and respondents here, because they were holding under a different election and have a different term." What difference does that make so far as concerns the application of the doctrine of *res adjudicata?* The present case is not one where the city supervisors are asserting their right as against respondents to act as a board of county commissioners. Indeed, this proceeding is quite anomalous in that it calls for a theoretical discussion when there is no real controversy between

rival claimants, but where the determination is to be made just as effective as if the litigation were actual. The respondents here are not invoking *res adjudicata* against the successors in office of a previous body of supervisors who failed in the Lawson suit; but, if they were, the plea, on that account, should not be rejected. But the plea here is directed by the respondents, who are successors in office of predecessors who were relators in the Lawson case, and whose right to this office in that case was determined to be perfect, because the pertinent provisions of the constitution and general laws on the subject of county offices and county officers were paramount to similar provisions of articule XX and the Denver City charter. And this plea is directed against the people of the State of Colorado who were and are the parties petitioner in both cases. In the Lawson case the people, by its legal representative, authorized to bring the suit, took the position that the constitution and general laws relating to county officers, term of office, jurisdiction, duties and qualifications, were the paramount law of the land, and the apparently conflicting provisions of article XX and of the Denver City charter were to be disregarded, and held applicable strictly to municipal affairs, and in this way avoid the otherwise irreconcilable repugnancy of constitutional provisions which became effective at the same time. The people were successful there and obtained a decree establishing the supremacy of the state constitution and general laws, and respondents' title here is, as relator's title there was, based upon the judgment so rendered. Here the same people, by its legal representative, takes a squarely contrary position, and asserts and asks this court so to hold, that article XX, upon a special subject, and the Denver charter, enacted in pursuance thereof, override all other and conflicting consti-

tutional provisions and the general laws enacted in pursuance thereof. Is it not entirely clear that what this court really decided in the Lawson case was that county offices existed in Denver County, that election to fill them must be held in November, and that the general provisions of the state constitution and general laws on the subject control, and that special article XX and the Denver City charter, in conflict therewith, must yield?

If what we have said is true, then it follows that things decided in the Lawson case directly affect the public office itself and relate to public rights. That decision necessarily determined the very existence, the nature, powers, and duties, privileges, the jurisdiction, qualification, and source of the office. There cannot be conceived a case where a judgment more clearly affects and touches these essential attributes of a public office, and if this is so, according to the decisions, and even according to the majority opinion, the successors in office, relying upon the same source of title as their predecessors in which such determination was made, hold in privity with their predecessors and are not only bound by the previous judgment, but may assert it and rely upon it the same as could their predecessors, and use it as against their adversaries and all those who claim under them. And why should not the state be estopped by this judgment? Is it immune from the rule that applies to all other litigants when it voluntarily submits itself to the courts of its own creation? It certainly was a party in the Lawson case, the moving party, and advanced the contention therein which was decided in its favor. That judgment should and does estop it in any subsequent suit against the same party, and the privies in law of that party, from taking a different attitude. That doctrine is applicable here, since the judgment in the

former case touched so emphatically and unquestionably every attribute of the office of county commissioner, including the existence of the office itself. All the parties to it and their privies in law and estate are bound. Respondents here are clearly entitled to maintain their plea because they are privies in office to relators in the Lawson case as to all matters affecting the powers, duties, existence, etc., of that office, claiming as they do, under the same general right and from the same source, and petitioner here was petitioner there.—2 Black on Judgments, sec. 582; 23 Cyc. 1350.

6. That the doctrine of *stare decisis* applies to the class of cases to which this belongs is admitted. Constitutional questions are as much within its purview as are those based upon the statute or the common law. In *People v. LeFevre,* 21 Colo. 218, at page 241, this court said: ''We are not unmindful of the rule that the maxim *stare decisis* is applicable in its fullest sense only where property rights are involved. The doctrine, however, applies to constitutions as well as to statutory law, or to any other kind of law.'' In this case, however, it is not enforced, for the reasons stated in the opinion. Of course the court has the power to disregard every one of its own previous decisions if it sees fit to do so; but it should long hesitate to overrule a line of twenty or more cases upon the same subject, which it has been obliged to do in order to reach the conclusion which the majority opinion announces. If there ever was an instance where the maxim should be strictly applied, this case furnishes it. Nothing is further from our purpose than to revive the partisan passions which grew out of the adoption of article XX, and this reference is made to the subject, solely as warrant for the assertion that the questions here involved, and already twenty times decided the same

way, and which are now being reconsidered, unfortunately have become, and are, saturated with partisan feeling and party prejudice. The grounds given for refusing to abide by the former decision are that it is so manifestly wrong and the subject-matter is of such momentous public importance that it ought to be decided right, since it has not become a rule of property. Two decisions of this court, one written by each of the minority, are cited in support of this position. Neither, nor both, of them, nor any other cases that can be found, are authority therefor. A fair statement as to the *Colorado Seminary case*, 30 Colo. 507, ought to have included the real reason given for the refusal to enforce the maxim in that case. No other organization in the state had a charter similar to the one held by Colorado Seminary, and the former decision, which was modified, had not, and never could, become a rule of property on the faith of which private rights could be acquired. In the *Calhoun-Ajax case*, 27 Colo. 1, a former decision was overruled as wrong; but the court was not embarrassed in doing so, since it was based upon an erroneous conception of an act of congress, and a decision of a state court in construing it never could become a rule of property. The power to bring about that result rests exclusively with the supreme court of the United States.

We have already expressed our views as to the ruling in the Johnson case. We emphatically take issue with the statement in the majority opinion here that that decision has not become a rule of property. How such a statement came to be made, we are unable to discover. Less than one year after the Sours, and about one year before the Johnson, case was decided, this court, in *Parsons v. People,* 32 Colo. 221, had before it for consideration sections of the general revenue act of 1902, which levied upon all liquor

dealers in this state a license tax to produce state revenue. In the opinion, concurred in by Mr. Justice Steele, in answering the argument that article XX of the Denver charter vested such power to tax exclusively in the city of Denver, it was said: "Neither is this revenue act of 1902 in violation of any provision of article XX. In the majority opinion of this court in *People ex rel v. Sours*, 31 Colo. 369, it was clearly indicated that the general scheme of government therein contemplated is restricted to that of the municipality proper, and does not intrench upon county or state government. It does not purport to nullify the constitution or general laws of the state in so far as they pertain to county or state government, or attempt to interfere with the power of the state in raising state revenue. If there were no specific provision in that amendment upon the subject, such would be its construction." That decision directly affected Mr. Parsons' right of property. Thereby he gave up involuntarily some of his property. In the *City and County of Denver v. Hallett*, 34 Colo. 393, the opinion being by Justice Steele, handed down only a few months after the Johnson decision, the doctrine of that case was enforced, and thereby taxpayers of the city of Denver were compelled to contribute to the building of an auditorium. Among other things, Justice Steele said: "The purpose of the twentieth article was to grant home rule to Denver and the other municipalities of the state." In *Denver v. Bottom*, 44 Colo. 308, again enforcing the doctrine of the Johnson case, this court prevented Mr. Bottom from collecting his salary as county attorney, which he claimed of the new county government. As to Mr. Bottom, this decision had passed into a rule of property, as he ascertained to his financial loss. Perhaps the most conspicuous in-

stance where the doctrine of the Johnson case was enforced as a rule of property is to be found in *County Commissioners v. Lunney*, 46 Colo. 403. The opinion was written by Mr. Justice Hill, who concurs in the majority opinion in the case at bar, and it met the full approval of Chief Justice Steele and Mr. Justice Gabbert. Lunney sued the Board of County Commissioners of the City and County of Denver upon a demand aggregating over $30,000, which he claimed as a balance due him for transcribing a portion of the records of the late Arapahoe County which related to Adams County. The Board of Supervisors of the city of Denver, while assuming to act as a board of county commissioners of Denver County, had allowed this claim only a few days before they were ousted from office by this court under the application of the decision in the Johnson case and the other so-called county officers' cases, all of which are reported in vol. 34 of our reports. When the regularly elected board of county commissioners, which was let into office as the result of that decision, took their seats, they reconsidered Lunney's claim and disallowed it. On appeal to the district court the board's action was overruled; but, on error, this court reversed the ruling and held, under the doctrine of the Johnson case and the other county officers' cases alluded to, that the new board was the legally elected and constitutional board of county commissioners, and had the right to disapprove and nullify the previous action of the supervisors. Our judgment could not have been as it was unless the Johnson case was followed. That it was again enforced in the Lunney case as a rule of property is too plain for argument. If the decision of the majority in the case at bar is right, the decision in the Lunney case was wrong. Mr. Lunney has lost his claim of over thirty thousand dollars, whereas, if

the new doctrine of the present case had been en-
forced, Mr. Lunney would have got his money.
Other cases to the same purport as this might be
cited. These, however, are enough conclusively to
show that the Johnson case has become a settled rule
of property in this state. Rights have been acquired
by private individuals acting upon the faith of it.
Rights have been lost as the result of its enforce-
ment. This being so, the doctrine of *stare decisis*
should be strictly applied here.

For another reason equally persuasive, should
the doctrine be applied. The questions involved
here, as already stated, have become partisan in
character, and particularly in such cases should the
doctrine of *stare decisis* be followed. In the Le-
Fevre case, *supra*, it was applied in a case where
property rights were not involved. That was a con-
troversy merely over the right to a public office, and
this case is no stronger. In *Dickinson v. Freed,* 25
Colo. 302, the writer concurred in the decision solely
because a previous decision of our court, which he
did not approve, so required, if it was to be followed.
After so stating, the special concurring opinion at
page 307 says: ''But if the rule of *stare decisis*
should ever be rigidly adhered to, it is in election
controversies; for in no class of cases, and for rea-
sons apparent to any candid mind, are there stronger
reasons for the strict application of the rule.'' There
are other decisions of our court to like effect, but it
would avail nothing to reproduce them. There is
one case, however, to which particular reference
is pertinent. In 1904, what has been somewhat
harshly termed ''The original, exclusive, extraor-
dinary prerogative jurisdiction of the King's
Bench,'' which the constitution has conferred upon
our supreme court, was invoked by the people of the
state on the relation of its attorney general, and the

same was exercised, to secure for Denver a fair and honest election and to preserve the purity of the ballot therein in the impending state election. If memory serves aright, this action of our court was not received with unqualified or rapturous approval, particularly by those directly affected, but criticism, more or less caustic, followed. A few days before our November election in November 1910, a similar application to secure an election in Huerfano County was presented to this court. Four of the members who concur in the present majority opinion, and the two now dissenting, were then sitting, and a favorable response was given, with but one dissenting voice, jurisdiction was taken and the appropriate writ of injunction was issued, just as in *People v. Tool*, 35 Colo. 225. It may be, of course, that my brethren, who constitute the majority of this court now, and who did last October, think that the Tool case was rightly decided, and, if so, there is no pertinency in the present reference to, and comment upon, the assumption of original jurisdiction in the later case. But it is apprehended—and if in this we are in error, a retraction of the statement will follow on notice—that this majority, following many illustrious precedents of this court, were so impressed with the wholesomeness of the doctrine felicitously expressed by *"stare decisis,"* and were so determined tenaciously to adhere to it in accordance with the established practice,—though in so doing they ran counter to their own deliberate judgment,—that they sank their individual views and, guided by this universal rule that prevails in all countries where courts are governed so largely by precedents, assumed this most unusual jurisdiction on the authority of the reported Tool case, and fearlessly, and without much hesitation, let the sweeping writ of injunction go. It is submitted, with all earnest-

ness, that such action was a more extreme illustration of sticking fast to *stare decisis,* and on the faith of a single reported case as a precedent, than would be following here the rule in the Johnson case, approved and applied as it has been by twenty or more cases by the same court. For these and other reasons, so forcefully expressed in the brief of ex-Judge Dixon, we say, without hesitation, whatever may be the individual views of the present majority, they should observe the universal practice in such circumstances and yield obedience to at least twenty of our own previous decisions, although these adjudications are not in harmony with their own views. If within the course of a few years the personnel of this court changes, and a new majority should be of opinion that the Johnson case was rightly decided, and that the decision in the case at bar was so manifestly wrong that public interests demanded a reconsideration, with a view to its nullification, why, with equal propriety, may not the future majority, if some dissatisfied leading body of citizens demands it,—and, be it said with no thought of criticism, there is always enough dissatisfaction, often stimulating and healthful, in a progressive community to demand a change of almost any existing decision or policy,—put forth the "royal, extraordinary prerogative jurisdiction of the King's Bench," and revivify the Johnson decision, to which the present majority has administered a blow that has effected its quietus. This suggestion, were there not other compelling reasons, ought to stay the hand of the court in this most unusual and unprecedented proceeding, which it has permitted to progress to a conclusion.

7. It is not strange that the various counsel who have appeared in the many cases relating to article XX, have not always agreed among themselves as to its meaning and effect, and have not un-

qualifiedly assented to the prevailing opinion in the
Sours, or the dissenting one in the Johnson, case.
Apparently, as we have already seen, present coun-
sel for petitioner have imbued the present majority
with some of their new ideas quite at war with those
entertained by former judges whose views are avow-
edly adopted. In the able brief of Messrs. Riddell
and Thompson, in support of this petition, they re-
fer to the statement of Mr. Justice Steele in his
Johnson dissent, that, by the Sours decision, the peo-
ple not only could free, but, by article XX, had
freed Denver from several provisions of the consti-
tution. In language as diplomatic as masters of hu-
man speech can employ, counsel express their inabil-
ity to concur, by saying that the idea may be correct,
but the language is inexact. Yet they also add that
the sentence seems to concede what counsel them-
selves believe is not correct. But the full sweep of
the statement was essential to Judge Steele's argu-
ment, and his conclusion was not justified, if, upon
his statement counsel's explanation is grafted. One
of these same learned counsel appeared in a former
case, and he then took a position which, as we under-
stand it, is directly opposed to his present attitude,
as the quotation from his brief in that case, repro-
duced in Judge Maxwell's opinion in the Johnson
case, abundantly testifies. Indeed, that brief might
be well used now, as heretofore, as a text for the vari-
ous decisions in line with the Johnson case. The
oral argument of Mr. Richardson, on the same side
in the pending cause, bore ample evidence that his
adroit mind perceived the force of the argument em-
ployed by Mr. Justice Maxwell in applying the doc-
trine of the Sours case, and while the learned lawyer
thought the Johnson decision wrong and the Sours
decision right, he ventured to submit a suggestion,
which left a deep impression, that it might be well

also to reconsider the Sours case and put the decision on the defensible ground, consistent with the construction that the real and primary purpose of article XX was not to give home rule to Denver and other cities, but to consolidate the city and county governments of Denver into a new body politic, with only one anomalous form of government; though this court in every case and by every judge who participated, had held time and again that its sole purpose was to secure home rule. Counsel may be right, and there is much force in his argument for a reconsideration of the Sours case. Now that this court has entered upon the task of reconsidering mere reasoning of rightly decided cases, it ought to extend its jurisdiction and reconsider the Sours case, because, if for no other reason, the judgment here pronounced is irreconcilably repugnant, not only to the reasoning thereof, but to the decision itself. These reflections are prompted by the suggestion of the majority opinion that the meaning and effect of article XX is so obvious that no fair-minded person can have any doubt about it. That we may not be suspected of partiality, or accused of reproducing the views of those with whom we agree, we have summoned some of their own witnesses to testify that there really are some intelligent and prominent lawyers, even on the same side, who entertain quite radically different views as to the meaning of this alleged self-interpreting document.

8. If, however, we are wrong in all that has been heretofore said in this dissenting opinion, there are other considerations which make it not only just and right from a moral standpoint, but imperative on legal grounds, to continue in full force the Johnson decision. If a personal reference in a judicial opinion be pardonable, the statement may not be inappropriate here that the present writer does not be-

lieve that article XX was adopted as the constitution itself prescribes. His reasons therefor are stated in his dissenting opinion in the Sours case, reported at page 411 of the 31st Colorado Report. If the majority opinion here had not, by favorably commenting upon it, dignified the baseless charge that the majority in the Johnson case proceeded as if an article of the constitution was itself unconstitutional, and that article XX had been treated by them as an interloper instead of a duly authenticated member of the organic act, the present reference would not be made. No judge of this court, so far as we know, has ever said or intimated that, when an article or section has once become a part of—that is, has been legally adopted by the people as a part of—the state constitution, it is unconstitutional, unless, of course, it contravenes some part of the higher federal law. It would then be invalid, because the higher law, not the supreme law of the state, condemned it. But before a proposed or submitted amendment to a state constitution can become a valid part thereof, it must be not only in harmony with the higher law, but must be adopted by the people in the manner in which the same people has prescribed in some existing provision of that instrument. Equally fallacious is the criticism made by irresponsible persons, and apparently sanctioned in the opinion, that a permissible construction by a court of one article or section of a constitution that makes it harmonious with other provisions of equal rank in the same instrument and avoids a clash with the federal laws, while a different construction would produce an irreconcilable conflict, thereby ruthlessly sets aside a vital part of the organic act. What the Johnson decision did was to put an entirely permissible construction on section 2 of article XX, so as to make it harmonious, not only with other parts of the same in-

strument of equal dignity, but especially to make it conform to that requirement of the federal constitution which imposes upon every state the necessity to maintain therein a republican form of government. And in doing so, this court merely followed and applied the principle which the prevailing opinion in the Sours case said must be applied to make the article harmonious with the federal law.

Most strenuous endeavor was made in the dissenting opinion in the Johnson case to escape the logic employed by the same judge in the Sours case, and the effort has been renewed by counsel for petitioner here to supplement that attempt. We submit with all confidence, unsuccessfully, if the ordinary rules of correct reasoning are to govern. Let us see if Justice Maxwell's opinion in the Johnson case was properly based on the Sours decision. A mere reading of Judge Steele's prevailing opinion in the Sours case ought to satisfy any candid mind that his reasoning was correctly apprehended and applied. We proceed now to show from the record that the Steele opinion was exactly what Judge Maxwell said it was, and also that it was correctly applied in the Johnson case. In the Sours case, one of the pleas interposed by the respondents was that article XX was repugnant to the constitution of the United States "in that it creates, or undertakes to create, independent municipalities within the borders of the State of Colorado, with authority to create their own charters or organic laws, and to act and legislate independent of and out of the control of the general assembly of the State of Colorado, which is composed of the electors chosen from the entire State of Colorado, and set up such form of government as the inhabitants of such municipalities may deem proper." This excerpt is found in the brief prepared by the late Senator Hughes, H. M. Ora-

hood, and Calvin P. Butler. In support of this contention, Messrs. Whitford & Parks, in their brief in the Sours case, by way of argument, use the words which Mr. Justice Steele quotes at page 385 of his opinion, and which were reproduced by Mr. Justice Maxwell at page 148 of his opinion in the Johnson case. The words quoted by Judge Steele were not the only ones on the subject in the Whitford-Parks brief. Both of these distinguished lawyers were members of the senate when article XX was voted on, and in addition to the language quoted in the Sours opinion, they said: ''In the discussions in the senate on this act we could get no satisfaction from its supporters as to the extent of the power they laid claim to under the act. We certainly heard no contention made that it applied only to the local affairs of a municipality. In vain we tried to make them amend with some sort of limitation. We do not know whether they now propose to take that position or not—we mean the position that the act only carried authority to legislate on such city affairs that the present city is authorized to legislate on  *  *  *  If it were to be confined to city affairs, why didn't they say so? The mixing of the city government with the county government disposes of any such assumption. The county government is a legal subdivision of the state government. It is a state agency. It is the strong right arm of the state. Without it—without the county officers and their functions—the state would be impotent and helpless. * * * What is the net result, considering only the mixture? Is it local government only? Or is it local, county and state?  *  *  *  With the judiciary and the district attorney mixed up with the amalgamated county and city governments, are we to be told that this instrument only confers authority

on this charter convention to deal with municipal questions?''

Substantially the same argument was made in other of respondents' printed briefs. Of the briefs of the petitioner in that case, the most exhaustive was the one filed by Senator Rush and J. Warner Mills, reputed to be the framers of article XX, and who were supposed to know, if any one does, what its purpose was. This is what they then said in . answering the arguments of their opponents on this branch of the case. At page 322 of the brief, which was intended as a sufficient and conclusive reply to respondents' contention, they say that section 2 of article XX sufficiently refutes the argument, for they add, it ''brings the city and county of Denver strictly within the control and supervision of the state as to all matters of state concern. The only way a county comes in contact with the state is through its agents, its officers. And by this provision all the fears of counsel may well subside and peace possess their souls. It is as if article XX had said that state control in state affairs is supreme, but, as to municipal affairs, the state will allow the people of the city to govern themselves.'' In summarizing their conclusion at page 355, they say of article XX: ''It is along the line of municipal growth and development. It relieves the state of petty local matters that can better be attended to by the local authorities. It gives municipalities the power of self-government in local affairs. It divorces Denver from the infamous system of despotic and autocratic government which is now its curse and its undoing. It places in the hands of the people such power that they may protect themselves from rapacious robbery, both official and corporate, *but at the same time preserving to the state its full power over all matters of state cognizance and proper state control.*''

Elsewhere in this voluminous brief, the declaration was frequently made that the sole purpose of article XX was to provide home rule for Denver and other cities, and that county and state affairs were not within its purview. The principal oral arguments at the hearing in the Sours case were by the late Senator Hughes for the respondent, and by ex-Senator Patterson for the petitioner. With great power and eloquence these able lawyers presented their views on all the questions raised in that case, and, at great length and with unusual force and clearness dwelt upon this particular phase of the controversy which we have just outlined. There was not the slightest doubt in the minds of any of the judges about the radically different constructions which these astute gentlemen put upon article XX. Senator Hughes, in behalf of respondents, contended that, as to the newly defined territory and with respect to the new body politic, the intention of article XX and the language sufficiently evidenced the intent, was to cut it loose from the state constitution and general laws, and to free it from supervision by the general assembly, and to invest the people thereof with full and unrestrained power to legislate upon all city, county and state affairs as they saw fit. Senator Patterson, in behalf of the petitioner, contended, in harmony with its briefs, that there was no warrant for such construction, but, on the contrary, the new public body created was restricted, in its administration, solely to local or municipal affairs. It was in answer to the foregoing contentions of opposing counsel that Mr. Justice Steele used the argument he did, and stated that if respondents' construction was correct, the amendment could not be sustained. It was necessary, therefore, in order to save any portion of it whatever, to hold, as was done, that it must be construed, considered and interpreted as having

for its sole object, to use Judge Steele's own language, the "securing to the people of Denver absolute freedom from legislative interference in matters of local concern." And he added, "So considered and interpreted, we find nothing in it subversive of the state government, or repugnant to the constitution of the United States." We submit that the decision was squarely made that only municipal, and not county or state governmental, affairs were within the purview of the article. The federal compact must at all times be observed. The state can never rid itself of the sovereign legislative power exclusively to control and regulate all county and state affairs. To do so would be to incapacitate itself to maintain its own existence, and leave it powerless to keep its sacred obligations to the federal government. The state is as powerless to delegate any essential part of its sovereign legislative power as it is to yield all of it. It is beyond cavil that legislation to fix the term of a county or a state officer, or "agency," to prescribe his salary, time of election, jurisdiction, etc., is strictly the exercise of sovereign legislative power, which, under our form of state government, resides only and exclusively in our general assembly—subject, of course, to constitutional limitation. And yet, just such legislation as this is exactly what the majority opinion says article XX has delegated to the people of Denver, but which Mr. Justice Steele said could not be accomplished, even by constitutional amendment.

So that it is altogether clear that, in the Sours case, this court, in order to get article XX into the constitution, was obliged to give it a construction probably different from what some of its language, without reference to the context, might import; but of that its friends ought not to complain.

A reading of all three opinions in the Sours case

discloses that there were other equally imperative
reasons for restricting the scope of the amendment
solely to local affairs. If it was given the interpre-
tation which the respondents there contended for,
and which the majority opinion here has put upon it,
then the amendment embraced at least two distinct
and separate schemes or subjects; an anomalous
combined form of city and county government, each
of which had always theretofore been regarded as a
separate subject of legislation, and home rule for the
government of the two distinct entities constituting
the combination. The thing submitted as article XX
would, if construed as it is herein, clearly constitute
at least two amendments, each consisting of at least
one subject. And while amended section 2 of article
XIX permits more than one amendment to be sub-
mitted at the same general election, if the proposal,
though in the form of a single amendment, contains
more than one subject, each must be separately sub-
mitted so that it may be separately voted on. The
proposal embodying article XX was not separately
submitted or voted on. It necessarily follows that
the interpretation made in the Sours case had to be
given in order to escape the inhibition of article XIX.
Attention is called to the dissenting opinion in the
Sours case at 424, that relators' counsel there "re-
peatedly assert that the only object of the amend-
ment is to give home rule to Denver."

There is still another reason for restricting ar-
ticle XX to local affairs. If its meaning is what
the present majority says it bears, even according
to the reasoning both of Justice Steele and Justice
Gabbert in their separate opinions in the Sours case,
and in the dissenting opinion of Justice Steele in
the Johnson case, the article would directly, not in-
cidentally, and radically amend, or altogether re-
peal, some one or more sections of at least sixteen

different articles of the constitution, whereas by section 2 of article XIX, at the same session, the general assembly may not propose amendments to more than six articles.    While the writer did not, in the Sours case, and does not now, concur in the conclusions of the majority as to the meaning and scope of article XX, he submitted to that decision, as was his duty, and ever thereafter has consistently followed and applied it.    The efforts of its self-constituted friends will have brought about the mischievous results, if any attend its continued enforcement with the unwarranted construction put upon it. Would any one be so rash as to say that the amendment could or would have been saved if, in the Sours case, that interpretation had been made which the present majority sanctions?    And is it not quite apparent that, if the majority of the court in the Johnson case had adopted such interpretation, they would have overruled the Sours decision and at the same time removed article XX from its setting in the peaceful bosom of the constitution, just as, in the Sours case, the entire court, if forced to such interpretation, would, in the first instance, have declared it not entitled to admission into that instrument?    The writer is ready to admit that the construction made by Senator Hughes and his associates is correct.    So many reasons, however, were found for declaring the amendment not legally adopted, that he refrained from then expressing an opinion as to the construction which, in the view of the majority, had to be made in order to save the amendment.    But what we say, with all the emphasis at our command, is that this court, having effected the salvation of article XX as a part of our organic law, by placing on it the construction that it was restricted solely to municipal or local matters, should forever thereafter adhere to and enforce the article

with the same construction then given. If that construction was good enough to save the article, it is good· enough now, when its practical operation is called in question.

In the proceeding in the Sours case, the people of the state of Colorado as a party litigant obtained a decision that the sole purpose of article XX was to secure home rule for Denver and other cities, and so put it into the. constitution. Such its framers thought was its purpose, for, in submitting it to a vote of the people, the tickets had on them: ''For Home Rule for Cities,'' and ''Against Home Rule for Cities.'' Having got the article securely imbedded in the constitution, the same people, by its attorney general, as a party in a second proceeding —the Johnson case—sought and obtained a judgment enforcing one of the announced doctrines of the Sours case, namely, that home rule for cities was the sole purpose of the amendment. In a third—this proceeding—the same people, by another attorney general, repudiates the two former decisions which were given at its own demand, and, in accordance with its own contention, and asks for, and has obtained, a reconsideration, with the result that these former decisions are overthrown and new and directly contrary doctrines established. If a private party so conducted himself, it could be well said that he was guilty of bad faith, a species of false pretense, for it would present a case where a party got a favorable decision upon one theory, and, after having enjoyed the full benefit of it, afterwards, for some reason satisfactory to himself, sought to obtain a directly contrary holding to meet his own changed condition. The court should not lend its aid to any such behavior. If some future attorney general should think the Johnson case absolutely sound, what is to prevent him from reopening the question

and succeeding therein, if, by the change in the personnel of the court which sometimes occurs, he is able to find a complaisant majority? The endless chain naturally occurs to the reflective mind.

All that has been done in this proceeding may be useless labor, wasted effort, so far as the decision is intended as a guide for future action, as the signs of the times indicate the early approach of the commission form of government, and the rumbling of the advancing columns of the usually victorious army of its advocates may be heard by the listening ear. Whether it comes or not, we felt it a duty to register our dissent here and give our reasons for it. The fervent hope is expressed that the present announcement be received with the submission and respect which decisions of this court should always command. We concede to our brethren of the majority the same desire to do their duty and declare the law as they apprehend it, which we claim in our own behalf. That office holders who are members of an opposing political party would be kept in office if the views of the minority judges had prevailed adds nothing to their fairness. Neither does the fact that officers of the same political faith as four of the majority judges are to be ousted as the result of their views, impart to their decision any virtue that it would not otherwise possess. And the purely fortuitous circumstance that the present city administration of Denver, which, by this same decision, is invested with power to designate the "agencies" to take the places of their decapitated brothers, is of the political faith of such majority, ought not to detract from their impartiality, or lessen the respect and confidence which conscientious performance of a delicate, and sometimes embarrassing, public duty ever merits.

Mr. JUSTICE GABBERT, dissenting:

The opinion of the majority, which overrules the previous decisions of this court bearing on the principal question involved, appears to proceed upon the theory that these decisions overlooked the fact that article XX was a part of the constitution. This assumption is purely gratuitous and misleading. It has always been recognized as a part of the constitution in every case in which it was involved, and this court, as now constituted, has not, as the majority opinion would indicate, discovered and promulgated something new and startling, by declaring that article XX is a part of the constitution—a fact which no one has ever disputed, and which even the veriest tyro knows. What has been heretofore decided in the case referred to is based upon its interpretation and effect in connection with other provisions of the constitution of equal rank, and to which force and effect must also be given. Thus construed and tested, it was held, beginning with the first decision, where the article was involved—the Sours case—that its whole scope and purpose was to provide home rule for certain cities with respect to matters local in their nature. On this subject, Mr. Justice Steele said:

"The amendment is to be considered as a whole, in view of its express purpose of securing to the people of Denver absolute freedom from legislative interference in matters of local concern; and so considered and interpreted, we find nothing in it subversive of the state government or repugnant to the constitution of the United States."

In the same case, the writer said: "The whole scope and purpose of the amendment was to provide home rule for certain cities with respect to certain governmental matters local in their nature";

and also said: ''What particular subjects, however, relating to governmental affairs are embraced in the amendment, is a matter for the convention assembled to form a charter to most carefully consider. It should also be borne in mind that there may be provisions of the constitution other than article XX which must be observed in the creation of a charter.''

Clearly, ''local matters'' could not extend beyond municipal affairs, for the very obvious reason that, to give the article any other scope by determining that under its provisions the people of the city and county of Denver could control county affairs in any respect, to the exclusion of either the executive or legislative departments, would include governmental functions relating to state affairs, powers which can only be exercised by the whole people of the state under their constitution, and the different departments of government thereby created. It was only by giving it this construction that the article could be upheld. Speaking to this point, Mr. Justice Steele said, in the Sours case:

''Even by constitutional amendment, the people cannot set apart any portion of the state in such manner that that portion of the state shall be free from the constitution, or delegate the making of constitutional amendments concerning it to a charter convention, or give to such charter convention the power to prescribe the jurisdiction and duties of public officers with respect to state government, as distinguished from municipal or city government. The duties  *  *  * , generally, of county officers, are mainly governmental; and so far as they are governmental, they may not be controlled by other than state agencies, without undermining the very foundation of our government. Under the constitution of the United States, the state government

must be preserved throughout the entire state, and it can be so preserved only by having within every political subdivision of the state such officers as may be necessary to perform the duties assumed by the state government under the general laws as they now exist, or as they may hereafter exist.''

The particular criticism of the previous decisions of this court by the majority opinion, is directed to the Johnson case, of which it is said, in effect, that it is wholly incomprehensible. That an opinion is incomprehensible to some should not always be regarded as indicative that it is not sound. Since the opinion was handed down in the Johnson case, it has been recognized by all political parties, and by every branch of the state government, as the law; and having thus been acquiesced in for several years by those most vitally interested, and particularly by the same litigant in that case that now appears here, namely, the people of the state, ought to be, and is, sufficient to estop all parties, including the courts, from questioning its correctness, and especially upon grounds not tenable, and heretofore so decided by solemn judicial construction.

Again, in speaking of the Johnson case, which, assertions to the contrary notwithstanding, was based upon what had been declared in the Sours case, the majority opinion says:

''Thus, we are confronted with the grotesque spectacle of one case decided upon the authority of another, the main features and principles of which latter case the former flatly overrules.''

In the Johnson case, it was determined that the people could not, by an amendment to the constitution, vest in the citizens of the city and county of Denver any authority to legislate upon matters other than those purely municipal. In the majority opinion here it is said they can, and this, it is claimed,

is in conformity with the decision in the Sours case, which, we have pointed out, is not true; so that, paraphrasing the quotation above referred to, we are confronted with the "grotesque spectacle" of a decision professed to be based upon the Sours case which, however, it "flatly overrules."

In the Sours case, no charter provision, as in the case at bar or in the Johnson case, was before the court for consideration. The basic principle upon which the latter was grounded was the proposition deducible from the above quotation from the opinion in the Sours case, wherein it was said, in substance, in addition, in speaking of the effect of article XX in displacing the constitution of the state, the general laws, and authority of the general assembly, that if the article must be given that construction, it could not be upheld.

The authority to provide by charter the officers who shall perform the duties of county officers appears to exist, in the opinion of the majority, by virtue of the provision that "every charter shall designate the officers who shall respectively perform the acts and duties required of county officers to be done by the constitution or by the general law, as far as applicable." Speaking to this point, it is said in the majority opinion, in substance, that to give the article a construction which permits a charter to provide agencies different from those provided for other counties in the state to discharge the functions of county officers does not in any manner affect the state government. This conclusion is based upon an argument to the effect that to ask the question if it does, is to answer it. Notwithstanding that this appears to be regarded as a lucid explanation of what the majority evidently recognize as an important question, we are forced to admit that it does not enlighten us; and neither does it appear to have

been satisfactory to the majority, for further questions are propounded, which evidently are intended to elucidate that a federal inhibition is not invaded by providing in the charter that officers are to be chosen in the spring-time, instead of autumn; that they are elected for four, rather than for two years; that one set of officers is named to discharge the duties pertaining to both municipal and governmental affairs, since all such governmental acts and duties in this territory remain intact and are to be fully performed. None of these questions or premises upon which they are based are pertinent; rather, the question is, What authority has this state to create an absolutely independent sovereignty within its borders, which the federal constitution expressly inhibits? This, the majority opinion holds, has not been done, because the government provided for the city and county of Denver rests solely upon the will of the people, which they may modify or withdraw in the future. The opinion then proceeds to state, in substance, that since the power rests with the people, to completely annul article XX, or amend or alter its provisions at will, it follows, as of course, that a sovereignty independent of the state has not been created, "for, were it otherwise, such change in the constitution would be impossible." The part just quoted seems to be a recognition of the proposition that if article XX does permit the creation of a sovereignty independent of the state, then, necessarily, it could not be upheld.

Let us consider, briefly, if the arguments advanced in the opinion by which it is attempted to demonstrate that an independent sovereignty has not been created by the charter, are sound. On this phase of that proposition, the question is not what the people may do, in the future, with respect to annulling or modifying article XX; but what have

they done, according to the interpretation of the article by the majority and the charter under consideration, which the majority opinion says is a valid exercise of power delegated by article XX. The question is not difficult to answer. Provision has been made in the charter for so-called agencies to discharge the functions of county officials. Their term of office, their compensation, time of election, and filling of vacancies, are thereby fixed. In short, the legislative and executive departments are shorn of all power to control the so-called agencies in any of these respects—a power which, according to the opinion of the majority, the people of the city and county of Denver may exercise by virtue of article XX. If this is not an absolute release of such control by the state over county officials who, in the discharge of their duties, must exercise governmental functions in which the state is directly interested, and which it is necessary to discharge under the constitution, and which the state must control, in order to carry on the state government, it is impossible to frame a provision which would bring about this result. Sovereignty with respect to governmental matters and functions necessary to carry on and maintain the state government, cannot be divided. It cannot be delegated to the people of an independent territory to make provision for governmental matters necessary to carry on state government, in such territory, and exercised by the remainder of the people of the state for that portion not embraced in such independent territory, unless we recognize that the people may create out of a part of the state an independent sovereignty, something which the majority opinion says cannot be done, but which, by their conclusion, has been done. It is not sufficient to say that this has not been accomplished, because the people may repeal article XX. As long as it

stands as a part of the constitution, the independent sovereignty thereby created exists; so that the article is invalid, because of the conditions it has brought into existence by the construction now given it, in the majority opinion, entirely independent of what action the people may take in the future on the subject of repealing it.

It is said, in substance, in the majority opinion, that the people of the state have plenary power by constitutional amendment to provide such methods of government for any part of the state as they please, so long as there is no violation of the federal compact, and as they have by these means authorized the people of the city and county of Denver to designate the agencies by which governmental duties therein shall be discharged, no provision of the federal constitution has been violated. That is not the test. By the decision of the majority, the state has released its authority to absolutely control these agencies. If the authority to which the power to designate and elect these agencies refuses or neglects to exercise it, the state, neither through the executive nor legislative departments, can take any steps to supply these agencies, and the result would be that the territory embraced within the city and county of Denver would be without officials to discharge the functions of county government, and the state powerless to supply them—a condition which Mr. Justice Steele, in the Sours case, said would undermine the very foundations of our state government, which can only be preserved by having within every political subdivision of the state the officers necessary to perform the duties devolving upon the state government.

As stated before, the test of the validity of a law is not what has been done, but what, under its provisions, may be done or accomplished. With un-

limited power delegated to the people of the city and county of Denver to name the agencies which shall discharge the functions of county officials, with no power reserved to the remainder of the people of the state through any department of their government, or by any law which the general assembly might pass, to provide against the contingency of the people of the city and county of Denver disobeying the mandate of article XX, is it not clear beyond successful contradiction that the people of the state have surrendered their sovereignty over the territory embraced within the city and county of Denver? The majority opinion attempts to answer it by asserting that, because article XX contains a mandate that agencies shall be designated by charter to discharge the functions of county officials, that, therefore, control with respect to these matters is not surrendered. This begs the question in that it fails to meet the proposition that the state is powerless to act if this provision is not observed. No one questions the authority of the people to amend their constitution, but in so doing the mandate of the federal constitution, as well as of the state, must be observed. The people, when amending their fundamental law, are as much bound by the limitations thus imposed as any other legislative body.

It was freely prophesied, when article XX was adopted, that it would lead to endless litigation. It gave promise that it would until the decision in the Johnson case was announced, which clearly defined its meaning and scope by limiting the authority of the people of the city and county of Denver to provide by charter for municipal government only. Now the line thus drawn, which was clear and definite, leaving no room for debate with respect to what matters could be legislated upon by charter, has been obliterated. Necessarily, litigation without end

must follow. Had either the doctrine of *stare decisis* or *res judicata* been applied, as it should have been, the confusion and litigation sure to follow on the heels of the opinion promulgated by th · majority, would have been prevented.

Now that the majority opinion opens the door for some future party or future organization to again institute proceedings calculated to obtain another and different interpretation of the article, than that given it in the case at bar, it is only a question of time when such a proceeding will be commenced. When and where is this to end? When will the people of the city and county of Denver know that they are living under a fixed and stable government? Each time there is a change in the personnel of this court, litigation of the character suggested is almost certain to be commenced; but, worse than all this, the construction now given the article renders it absolutely invalid, because it not only violates the federal constitution, but likewise violates article XIX of our state constitution, which inhibits the general assembly from proposing amendments to more than six articles of the constitution at the same session. Under the construction given the article in the Johnson case, no question could be successfully raised regarding its validity. Now that it can be questioned, it must necessarily follow that the acts of the municipal and county authorities in the past, as well as in the future, of every kind and character, may be drawn in question, and, possibly, invalidated.

In any event, the uncertainty of the validity of article XX, as the result of the construction placed upon it by the decision of the majority, may seriously embarrass the future administration of municipal and county affairs. The decision in the Johnson case construed the constitution as a whole, and, as thus construed, rightly limited the power of the peo-

ple of the city and county of Denver under the pro-
visions of article XX to create a charter dealing
with municipal affairs only. It brought order out
of chaos. This condition should have been main-
tained by dismissing the proceedings.